**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Court
Southern District of Te
FILED

NOV 1 7 2005

Michael N. Milby, Clerk of C

| | |
|---|---|
| GEORGE E. MCFARLAND, | § §§ |
| PETITIONER, | § § |
| -v- | § § |
| DOUG DRETKE, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, INSTITUTIONAL DIVISION, | § § § § |
| RESPONDENT. | § § § |

H-05 3916

CIVIL ACTION NO. 4:05-MC-00250

---

## PETITION FOR WRIT OF HABEAS CORPUS

THIS IS A CAPITAL CASE

W.E. Herman III
Texas Bar No. 09513800
S.D. Texas Admission No. 1865

Humble Law Center
116 S. Avenue C
Humble, Texas 77338
(281) 548-1500
(281) 446-1013

Counsel for Petitioner

Of Counsel:
R. Paul Wickes
Amanda J. Gallagher
Brenda D. DiLuigi
D. Alison von Rosenvinge
Linklaters
1345 Avenue of the Americas
New York, New York 10105
(212) 903-9000
(212) 903-9100

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................ vi

INTRODUCTION ............................................................................................... 1

JURISDICTION ................................................................................................. 2

PRIOR PROCEEDINGS .................................................................................... 2

STATEMENT OF FACTS .................................................................................. 2

      A.      The Crime Scene Investigation ...................................................... 3

      B.      The Chevrolet Suburban ................................................................ 5

      C.      The Police Investigation and Photo Identification ....................... 5

      D.      The Arrest and Line-Up .................................................................. 5

      E.      Grand Jury Testimony .................................................................... 6

      F.      Roles of John Benn and Sanford Melamed as Defense
             Counsel ........................................................................................... 7

      G.      Defense Counsel's Failure to Prepare for Trial or Investigate ............... 8

      H.      Judicial Proceedings – The Guilt/Innocence Phase of Trial ................. 10

             1.      Opening Statements .......................................................... 10

             2.      Benn's Persistent Sleeping During Critical Portions
                    of the Trial ....................................................................... 10

             3.      Lack of Preparation for Cross Examination ................... 12

             4.      Testimony Regarding the Chevrolet Suburban ............... 12

                  a)      Testimony of Police Officer H.C. Jordan ............ 12

                  b)      Testimony of James L. Powell ............................ 12

                  c)      Testimony of Officer Todd Miller ...................... 13

             5.      Testimony of Craige Burks ............................................. 14

6. Testimony Regarding the Alleged Crime Stoppers Call ...........................16

7. Testimony of Carolyn Bartie.................................................................18

I. Judicial Proceedings – The Punishment Phase.........................................19

J. Judicial Proceedings – Motion for a New Trial ....................................................21

K. Defects in McFarland's Underlying Appeal..........................................................22

L. The State Habeas Proceedings ...........................................................................22

ARGUMENT..............................................................................................................24

POINT ONE THE COURT OF CRIMINAL APPEALS' DECISION WAS
CONTRARY TO, AND AN UNREASONABLE APPLICATION OF,
THE SUPREME COURT'S DECISION IN
UNITED STATES v. CRONIC BECAUSE BENN'S SLEEPING
DEPRIVED MCFARLAND OF HIS RIGHT TO COUNSEL
GUARANTEED BY THE SIXTH AMENDMENT TO THE
UNITED STATES CONSTITUTION ....................................................24

A. The Standard for Determining Sixth Amendment Violations
Under Cronic.......................................................................................................24

B. Benn's Sleeping Denied McFarland of Counsel at a Critical Stage
Of His Trial..........................................................................................................25

C. Melamed's Presence in the Courtroom Did Not Cure Benn's Failures .................26

1. Melamed's Lack of Authority Created a Circumstance
Where it Was Unlikely that He Could Provide Effective
Assistance.............................................................................................27

2. Benn's Presence at and Control over the Trial, Created a
Circumstance Where it Was Unlikely that Any Counsel
Could Provide Effective Assistance .......................................................29

3. Melamed's Lack of Experience Created a Circumstance
Where it Was Unlikely that He Could Provide Effective
Assistance to McFarland.......................................................................31

D. McFarland's Counsel Failed to Subject the Prosecution's Case
to Meaningful Adversarial Testing ......................................................................32

1.  Failure to Test the Credibility Of Carolyn Bartie and
    Craige Burks...........................................................................33

2.  Failure to Challenge Evidence Regarding the Chevrolet
    Suburban .................................................................................36

3.  Failure to Participate in the Punishment Phase of Trial ...........................38

4.  Benn's Bolstering of the Prosecution's Case Amounted to
    an Abandonment of McFarland's Defense .............................................39

POINT TWO          THE STATE HABEAS COURT'S DECISION REFLECTS
                   AN UNREASONABLE APPLICATION OF THE SUPREME
                   COURT'S DECISION IN STRICKLAND v. WASHINGTON,
                   AS MCFARLAND'S COUNSEL'S PERFORMANCE FELL
                   BELOW AN OBJECTIVE STANDARD OF
                   REASONABLENESS AND PREJUDICED MCFARLAND..................40

A.  The Standards for Determining Sixth Amendment Violations
    Under Strickland ....................................................................................40

B.  Benn's Sleeping at Trial Was Unreasonable and Prejudicial
    Under Strickland Regardless of Melamed's Presence ........................................41

C.  Counsel's Failure to Prepare for Trial
    Did Not Meet the Standards Required By Strickland ........................................42

    1.  Counsel's Complete Failure to Investigate and Prepare Did Not
        Meet the Standards Required by Strickland................................................42

    2.  Benn and Melamed's Failure to Investigate Was Not a
        Strategy ...................................................................................47

    3.  Counsel's Failure to Investigate and Prepare Prejudiced
        McFarland .................................................................................49

D.  Counsel's Conduct at the Trial Was Unreasonable and Prejudicial
    Under Strickland ....................................................................................52

E.  Counsel's Failure to Investigate and Prepare for the Punishment
    Phase of McFarland's Trial Was Objectively Unreasonable
    and Prejudicial ....................................................................................55

    1.  Neither Benn nor Melamed Prepared for the Punishment
        Phase of McFarland's Trial..............................................................55

    2.      Counsel's Failure to Investigate and Present Mitigation
Evidence Was Unreasonable and Prejudicial Under Strickland ...............57

POINT THREE        MCFARLAND'S CONSTITUTIONAL RIGHTS WERE
VIOLATED AS A RESULT OF THE STATE'S FAILURE TO
DISCLOSE EXCULPATORY EVIDENCE PURSUANT TO
BRADY V. MARYLAND...................................................................65

    A.     The State Is Prohibited from Withholding Evidence Relating to the
Credibility of Craige Burks' Trial Testimony .....................................65

         1.      Background ...........................................................................65

         2.      The Record Suggests that the Prosecution Withheld *Brady*
Material in Violation of McFarland's Constitutional Rights...................67

         3.      This Court Should Exercise its Discretion to Conduct an
Evidentiary Hearing And/Or An *In Camera* Review of the
Evidence in the State's Possession.........................................70

    B.     The State's Failure to Provide McFarland with Exculpatory Material
in Violation of Brady v. Maryland Entitles Him to a New Trial .........................71

         1.      The State's Conduct with Respect to the Crime Stoppers
Report Violated McFarland's Constitutional Rights................................73

         2.      There Was a *Brady* Violation Through the Failure to
Turn over Walter Burks' Grand Jury Testimony upon
McFarland's Timely Request..................................................76

POINT FOUR         THE LINE-UP DURING WHICH BARTIE IDENTIFIED
MCFARLAND VIOLATED MCFARLAND'S SIXTH
AMENDMENT RIGHT TO COUNSEL.................................................78

    A.     McFarland Had a Right to Counsel at the January 3, 1992 Line-Up
Because a Complaint Had Been Filed Against Him on January 2, 1992..............79

         1.      Under Texas Law, the Filing of a Complaint Commences
Adversary Judicial Proceedings .............................................78

         2.      McFarland's Right to Counsel Attached After the
January 2, 1992 Complaint Was Filed Against Him................................79

    B.     The January 3, 1992 Line-Up Was a Critical Stage of the Proceeding
and the Necessitated Presence of Counsel.........................................80

C.     McFarland Did Not Waive Counsel ..................................................................81

D.     Evidence of a Witness' Identification from an Unconstitutional
Line-Up Is Inadmissible at Trial .....................................................................82

POINT FIVE       ERRORS OCCURRING DURING THE CHARGE TO
MCFARLAND'S JURY VIOLATED HIS RIGHTS UNDER
THE CONSTITUTION ......................................................................84

A.     The Second "Special Issue" Contained in Tex. Code Crim. Proc.
Art. 37.071 (Vernon 1992) Was Unconstitutional as Applied
to McFarland...................................................................................................84

B.     McFarland's Eighth and Fourteenth Amendment Rights Were
Violated by the Court's Failure to Inform the Sentencing Jury of
the Meaning of a Life Sentence .......................................................................86

POINT SIX       THE ADMISSION OF EVIDENCE OF UNADJUDICATED
EXTRANEOUS OFFENSES DURING THE SENTENCING
PHASE OF PETITIONER'S CAPITAL MURDER TRIAL
VIOLATED MCFARLAND'S RIGHTS UNDER THE
EIGHTH AND FOURTEENTH AMENDMENTS TO THE
CONSTITUTION...............................................................................89

PRAYER FOR RELIEF ..........................................................................................92

AFFIDAVIT OF VERIFICATION..........................................................................93

## <u>TABLE OF AUTHORITIES</u>

**Page**

## <u>CASES</u>

<u>Adanandus v. State</u>,
866 S.W.2d 210 (Tex. Crim. App. 1993) ....................................................................43

<u>Anderson v. Johnson</u>,
338 F.3d 382 (5th Cir. 2003) ..................................................................<u>Passim</u>

<u>Apprendi v. New Jersey</u>,
530 U.S. 466 (2000) .............................................................................................90

<u>Autry v. Estelle</u>,
706 F.2d 1394 (5th Cir. 1983) ............................................................................89

<u>Banks v. Dretke</u>,
540 U.S. 668 (2004) ..............................................................................69, 72, 73

<u>Barnhill v. State</u>,
657 S.W.2d 131 (Tex. Crim. App. 1983) .......................................78, 79, 83

<u>Bell v. Cone</u>,
535 U.S. 685 (2002) .............................................................................................25

<u>Bell v. Watkins</u>,
692 F.2d 999 (5th Cir. 1982) .............................................................................43

<u>Beltran v. Cockrell</u>,
294 F.3d 730 (5th Cir. 2002) .............................................................................43

<u>Belyeu v. State</u>,
791 S.W.2d 66 (Tex. Crim. App. 1989), <u>cert. denied</u>, 499 U.S. 931 (1991)................................85

<u>Bolton v. State</u>,
No. 01-03-00362-CR, 2004 WL 1404011
(Tex. App. – Houston [1st Dist.] June 24, 2004)........................................78

<u>Bouchillon v. Collins</u>,
907 F.2d 589 (5th Cir. 1990) .............................................. 47, 48, 53, 54

<u>Boyd v. Johnson</u>,
167 F.3d 907 (5th Cir. 1999) .............................................................................88

<u>Brady v. Maryland</u>,
373 U.S. 83 (1963)..............................................................65, 71, 73

Ex parte Brandley,
781 S.W.2d 886 (Tex. Crim. App. 1990) ................................................................69

Brewer v. Williams,
430 U.S. 387 (1977) ................................................................................................82

Brinegar v. United States,
338 U.S. 160 (1949) ................................................................................................79

Brown v. Texas,
522 U.S. 940 (1997) ..........................................................................................87, 88

Bryant v. Scott,
28 F.3d 1411 (5th Cir. 1994) ..................................................................43, 45, 46, 51

Burdine v. Johnson,
262 F.3d 336 (5th Cir. 2001) ............................................................................Passim

Burke v. State,
930 S.W.2d 230 (Tex. App. – Houston [14th Dist.] 1996) ......................................75

Butler v. State,
716 S.W.2d 48 (Tex. Crim. App. 1986) ..................................................................50

Carnley v. Cochran,
369 U.S. 506 (1962) ................................................................................................82

Code v. Montgomery,
799 F.2d 1481 (11th Cir. 1986) ..............................................................................45

Crawford v. State,
934 S.W.2d 744 (Tex. App. – Houston [1st Dist.] 1996)...........................71, 74, 75, 76

Dabbs v. State,
452 N.Y.S.2d 915 (App. Div. 1982) .......................................................................79

Dams v. State,
872 S.W.2d 325 (Tex. App. – Beaumont 1994) ......................................................78

Davis v. Alaska,
415 U.S. 308 (1974)...................................................................................33, 34, 35

Enmund v. Florida,
458 U.S. 782 (1982)................................................................................................85

Evitts v. Lucey,
469 U.S. 387 (1985) ................................................................................28

Felder v. McCotter,
765 F.2d 1245 (5th Cir. 1985) ................................................................79

Florida v. Nixon,
125 S. Ct. 551 (2004) .............................................................................39

Garcia v. State,
97 S.W.3d 343 (Tex. App. – Austin 2003) .............................................81

Giglio v. United States,
405 U.S. 150 (1972) ....................................................................68, 69, 71

Gilbert v. California,
388 U.S. 263 (1967) ...............................................................................83

Graves v. Cockrell,
351 F.3d 143 (5th Cir. 2003) ..................................................................70

Gray v. Lucas,
677 F.2d 1086 (5th Cir. 1982), cert. denied, 461 U.S. 910 (1983) ........46, 52

Green v. State,
872 S.W.2d 717 (Tex. Crim. App. 1994) ...........................................78, 79

Guidry v. Dretke,
397 F.3d 306 (5th Cir. 2005) ..........................................................70, 71, 80

Guidry v. State,
9 S.W.3d 133 (Tex. Crim. App. 1999) ....................................................77

Guy v. Cockrell,
343 F.3d 348 (5th Cir. 2003) ..................................................................62

Guy v. Dretke,
No. Civ. A. 5:00-CV-191-C, 2004 WL 1462196 (N.D. Tex. June 29, 2004) ........62, 63

Harrell v. State,
884 S.W.2d 154 (Tex. Crim. App. 1994) .................................................90

Harries v. Bell,
417 F.3d 631 (6th Cir. 2005) ..................................................................55

Harris v. State,
827 S.W.2d 949 (Tex. Crim. App. 1992) ................................................................89

Harris ex rel. Ramseyer v. Wood,
64 F.3d 1432 (9th Cir. 1995) ...............................................................................41

Holloway v. Arkansas,
435 U.S. 475 (1978) ...............................................................................................26

Hughes v. Johnson,
191 F.3d 607 (5th Cir. 1999) .................................................................................88

Huynh v. State,
901 S.W.2d 480 (Tex. Crim. App. 1995) ..............................................................79

Javor v. United States,
724 F.2d 831 (9th Cir. 1984) ................................................................25, 33, 34

Kemp v. State,
846 S.W.2d 289 (Tex. Crim. App. 1992) ..........................................................89, 90

King v. State,
657 S.W.2d 109 (Tex. Crim. App. 1983) ..............................................................89

Kirby v. Illinois,
406 U.S. 682 (1972) ...............................................................................................78

Kyles v. Whitley,
514 U.S. 419 (1995) ....................................................................71, 72, 77

Lindsey v. King,
769 F.2d 1034 (5th Cir. 1985) ...............................................................................69

Ex parte McFarland,
163 S.W.3d 743 (Tex. Crim. App. 2005) .........................................................Passim

McFarland v. State,
928 S.W.2d 482 (Tex. Crim. App. 1996) ..........................................................2, 30, 72

McFarland v. Texas,
519 U.S. 1119 (1997) .............................................................................................2

Michigan v. Jackson,
475 U.S. 625 (1986) ...............................................................................................81

Miller v. Dretke,
420 F.3d 356 (5th Cir. 2005) ................................................................................48

Miller-El v. Cockrell,
537 U.S. 322 (2003) ...............................................................................................80

Ex parte Mitchell,
853 S.W.2d 1 (Tex. Crim. App. 1993) ..................................................................72

Monroe v. Angelone,
323 F.3d 286 (4th Cir. 2003) .................................................................... 67, 69, 72

Mooney v. Holohan,
294 U.S. 103 (1935) ...............................................................................................68

Moore v. Dretke,
No. Civ. A. 603CV224, 2005 WL 1606437 (E.D. Tex. July 1, 2005) ...................71

Moore v. Illinois,
434 U.S. 220 (1977) ...............................................................................................78

Moreno v. State,
755 S.W.2d 866 (Tex. Crim. App. 1988) ..............................................................43

Napue v. Illinois,
360 U.S. 264 (1959) ...............................................................................................68

Neal v. Puckett,
286 F.3d 230 (5th Cir. 2002) .................................................................... 55, 62, 63

Nealy v. Cabana,
764 F.2d 1173 (5th Cir. 1985) .......................................................................Passim

Neil v. Biggers,
409 U.S. 188 (1972) ...............................................................................................83

New Mexico v. Henderson,
789 P.2d 603 (N.M. 1990) .....................................................................................88

Oliver v. State,
872 S.W.2d 713 (Tex. Crim. App. 1994) ..............................................................82

Plattenburg v. State,
972 S.W.2d 913 (Tex. App. - Beaumont 1998) .....................................................78

Profitt v. Waldron,
831 F.2d 1245 (5th Cir. 1987) ....................................................................47, 53

Ex parte Richardson,
70 S.W.3d 865 (Tex. Crim. App. 2002) .....................................................68

Ring v. Arizona,
536 U.S. 584 (2002) ...................................................................................90

Rogers v. State,
815 S.W.2d 811 (Tex. App. – Amarillo 1991) .........................................14

Rompilla v. Beard,
125 S. Ct. 2456 (2005) ........................................................................Passim

Rummel v. Estelle,
590 F.2d 103 (5th Cir. 1979) ....................................................................43

Silva v. Woodford,
279 F.3d 825 (9th Cir. 2002) ....................................................................49

Simmons v. South Carolina,
512 U.S. 154 (1994) ...............................................................................87, 88

Sims v. Brackett,
885 S.W.2d 450 (Tex. App. – Corpus Christi 1994).................................14

Smith v. Illinois,
390 U.S. 129 (1968) ...................................................................................33

Soffar v. Dretke,
368 F.3d 441 (5th Cir. 2004) ......................................................45, 49, 50, 51

State v. Frye,
897 S.W.2d 324 (Tex. Crim. App. 1995) ..................................................78

Strickland v. Washington,
466 U.S. 668 (1984) ............................................................................Passim

Summerlin v. Schriro,
__F.3d__, 2005 WL 2621506 (9th Cir. Oct. 17, 2005)............................49

Terrell v. State,
891 S.W.2d 307 (Tex. App. – El Paso 1994) ............................................78

Thomas v. Lockhart,
738 F.2d 304 (8th Cir. 1984) ...................................................................45

Thomas v. State,
837 S.W.2d 106 (Tex. Crim. App. 1992) ...................................... 70, 74, 75

Thomas v. State,
841 S.W.2d 399 (Tex. Crim. App. 1992) .................................................Passim

Tippins v. Walker,
77 F.3d 682 (2d Cir. 1996) .................................................................25

Tison v. Arizona,
481 U.S. 137 (1987) ...........................................................................85

United States v. Agurs,
427 U.S. 97 (1976) ......................................................................68, 72

United States v. Bagley,
473 U.S. 667 (1985) ......................................................... 69, 70, 71, 72

United States v. Cronic,
466 U.S. 648 (1984) .......................................................................Passim

United States v. Drones,
218 F.3d 496 (5th Cir. 2000) ..............................................................43

United States v. Gouveia,
467 U.S. 180 (1984) ...........................................................................78

United States. v. Gray,
878 F.2d 702 (3d Cir. 1989) ...........................................................47, 49

United States v. Swanson,
943 F.2d 1070 (9th Cir. 1991) .........................................................39, 40

United States v. Wade,
388 U.S. 218 (1967) ..................................................................81, 82, 83

Wiggins v. Smith,
539 U.S. 510 (2003) .......................................................................Passim

Williams v. Taylor,
529 U.S. 362 (2000) .......................................................................Passim

Wong Sun v. United States,
371 U.S. 471 (1963) ...................................................................................80

Wylie v. Texas,
777 S.W.2d 709 (Tex. Crim. App. 1989) ....................................................52

## STATUTES & RULES

28 U.S.C. § 2241(d) ......................................................................................2

28 U.S.C. § 2254 ........................................................................................1, 2

28 U.S.C. § 2254(d)(1) ..........................................................................Passim

28 U.S.C. § 2254(d)(2) ..........................................................................Passim

Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 ............................70

Tex. Code Crim. Proc. Ann. art. 1.06 (Vernon 1977) ...............................79

Tex. Code Crim. Proc. Ann. art. 15.03 (Vernon 1977) .............................79

Tex. Code Crim. Proc. Ann. art. 15.04 (Vernon 1977) .............................79

Tex. Code Crim. Proc. Ann. art. 15.05 (Vernon 1977) .............................79

Tex. Code Crim. Proc. Ann. art. 37.071 (Vernon 1992) ...........................84

Tex. Code Crim. Proc. Ann. art. 11.071 (Vernon 1977) ...........................23

Tex. Penal Code § 7.02(b) .........................................................................84

## OTHER AUTHORITIES

ABA Guidelines for the Appointment and Performance
of Defense Counsel in Death Penalty Cases (1989)...........................Passim

ABA Guidelines for the Appointment and Performance
of Defense Counsel in Death Penalty Cases (rev. ed. 2003). ....................57

ABA Standards for Criminal Justice (2d ed.1980) ....................................49

ABA Standards for Criminal Justice: Prosecution and Defense
Functions (Supp. 1982) .............................................................................43

Anthony Paduano & Clive A. Stafford Smith, <u>Deadly Errors: Juror</u>
<u>Misperceptions Concerning Parole in the Imposition of the Death Penalty,</u>
18 Colum. Hum. Rts. L. Rev. 211 (1987) ...............................................................................88

Harris County District Courts, Application for Court Appointments to
Felony Cases, Part B (May 2005) .........................................................................................31

John Makeig, <u>Asleep on the Job?: Slaying Trial Boring, Lawyer</u>
<u>Says</u>, Houston Chronicle, Aug. 14, 1992 ...............................................................................25

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Petitioner, George McFarland, is currently confined on death row at the Polunsky Unit in Livingston, Texas. Through undersigned counsel and pursuant to the Constitution of the United States and 28 U.S.C. § 2254, McFarland petitions this Court to issue a Writ of Habeas Corpus and to order his release from confinement on grounds that his custody violates the Constitution and laws of the United States.

## **INTRODUCTION**

George McFarland was convicted of capital murder and sentenced to death while represented by John Benn, who, by any measure, performed incompetently. Benn did nothing to prepare for McFarland's trial, and slept continuously through it. No physical or forensic evidence of any sort connected McFarland to the crime, and his conviction is supported only by the testimony of two witnesses. Although the witnesses' prior statements called their trial testimony into serious question, they were never confronted with those prior statements. Even the Texas Court of Criminal Appeals has grudgingly admitted that Benn's performance did not meet the minimum standards required by the Sixth Amendment.

Under clear precedent, the necessary result of Benn's incompetent performance is the issuance of a writ of habeas corpus. The Court of Criminal Appeals refused relief, however, because of the presence at counsel table of a second lawyer, Sanford Melamed. Melamed, perfectly inexperienced in capital cases, like Benn, essentially did no pre-trial preparation, and remained, throughout the trial, under Benn's direction and control. It simply cannot be the case that when a capital defendant is deprived of counsel by his lawyer's sleeping, his Sixth Amendment rights have been protected by a second lawyer, where that second lawyer is unable to provide independent representation because of the continued presence and control of the lawyer in charge.

It is now the duty of this Court to draw the inescapable conclusion from the record – that McFarland was convicted and sentenced as the result of the incompetent performance of his counsel, and is entitled to a writ.

## JURISDICTION

This Court has personal jurisdiction pursuant to 28 U.S.C. § 2241(d) because McFarland was convicted in the 262nd Judicial District Court in Harris County, Texas. Subject matter jurisdiction is conferred by 28 U.S.C. § 2254.

## PRIOR PROCEEDINGS

George McFarland was convicted of capital murder on August 12, 1992 and sentenced to death on August 14, 1992 in the 262nd District Court of Harris County. The Texas Court of Criminal Appeals denied his direct appeal on February 21, 1996, McFarland v. State, 928 S.W.2d 482 (Tex. Crim. App. 1996). On February 18, 1997, the United States Supreme Court denied certiorari. McFarland v. Texas, 519 U.S. 1119 (1997). McFarland filed a timely state habeas application, tolling the federal statute of limitations on May 21, 1997.

On June 8, 2004, the 174th District Court issued its findings of fact and conclusions of law, recommending that McFarland's petition be denied. The Texas Court of Criminal Appeals adopted the District Court's findings and denied the writ on May 18, 2005. Ex parte McFarland, 163 S.W.3d 743 (Tex. Crim. App. 2005).

## STATEMENT OF FACTS

George McFarland was convicted of capital murder on the frailest of evidence: the "eyewitness" testimony of a civilian employee of the Houston Police Department, and the testimony of McFarland's 20-year old nephew, who has demonstrably perjured himself at least once in connection with McFarland's case. Despite the fact that there was no other evidence linking McFarland to the shooting death of Kenneth Kwan, McFarland's lawyers did not

investigate, prepare or attempt to challenge the State's evidence, making his conviction and sentence a foregone conclusion.

There are two important facts that should be highlighted at the outset. First, McFarland's lead trial counsel, John Benn, performed no pre-trial preparation and repeatedly slept through critical portions of the trial. Second, Sanford Melamed, Benn's appointed assistant, who had never before participated in a capital case, also failed entirely to prepare for trial and deferred to Benn throughout the trial, only realizing – after the jury had returned a guilty verdict and it was far too late to investigate and defend McFarland against a death sentence – that Benn had utterly failed McFarland. Melamed was unable to rescue Benn's performance – primarily because he did not consider that to be his role.

## A.     The Crime Scene Investigation

On November 15, 1991, Kenneth Kwan was shot to death after returning to his convenience store from a bank. He was accompanied by a security guard, James Powell. Carolyn Bartie, an employee of the Houston Police Department, was sitting in her car in the store's parking lot at the time of the shooting.

The police found a single piece of physical evidence at the scene – one spent bullet on the floor inside the convenience store. The police also took statements from several witnesses, including James Powell and Carolyn Bartie.

According to Powell's statement:

- Powell and Kwan had returned from a bank with cash to be used for cashing payroll checks. (See Exhibit 1, Affidavit of James Powell, sworn to Nov. 15, 1991 ("Powell Aff.").)

- Before they got out of Powell's truck, Powell saw a man with a plastic bag of leaves crouching four or five feet from the door of the convenience store. (Id.)

- As Kwan and Powell began to walk toward the door of the store, the man with the plastic bag "got up, and he started running towards Kenny" still carrying the bag.

(Id.) Kwan began moving more quickly toward the door of the convenience store. (Id.)

- Powell then felt a gun placed against his head by a *different person*, who told him to drop his shotgun, which he did. (Id.)

- The person behind Powell backed away and picked up the shotgun. Next, Powell heard two shots from behind him and he hid behind a van. Powell saw Kwan fall, then heard the shooter say to the man with the bag, "get the bag, get the bag." (Id.)

- Powell described both individuals as black males, about six feet tall. He said the man with the bag was "kind of small," but could not describe the shooter. (Id.)

Bartie's testimony was materially different from Powell's. Bartie pulled into the parking lot shortly after Kwan and Powell did, and witnessed the beginning of the events from inside her car. (See Exhibit 2, Affidavit of Carolyn Bartie, sworn to Nov. 15, 1991 ("Bartie Aff.").) According to her statement to the police:

- The man who put a gun to Powell's head was the man with the plastic bag, who "grabbed the security guard around the neck [and] [t]hen fired two shots into the store in the direction that Kenny walked." (Id.)

- The man who had the bag of leaves, after shooting, told another man to "get the bag." (Id.)

- Although Bartie told police at the crime scene that "[i]t all happened so fast that I don't think that I would be able to identify either one of the guys who robbed the store," she described the man with the plastic bag (the shooter) as "in his mid to late 30's," "about 5'7" to 5'8" and [weighing] about 140 to 150 lbs" with "medium brown skin[]." (Id.)

Thus, while Bartie and Powell both saw the man with the plastic bag to the right of the door, Bartie says *he* was the shooter, and Powell says the shooter was *someone else*.[1] Bartie would later identify McFarland at trial as the perpetrator, despite the fact that McFarland's physical appearance in no way matched her description of the shooter. Neither Bartie nor Powell saw either of the men enter the store, but the only spent bullet was found inside.

**B.     The Chevrolet Suburban**

Some time later and several blocks away, the police found an abandoned Chevrolet Suburban, which had been stolen, with a shotgun in it. (S.F. Vol. 15 at 28:6-36:11.)[2] They did not find any evidence tying the Suburban or the shotgun to the Kwan murder or anything tying any individual to the Suburban.  (Id. at 31:17-36:11.)  Despite this lack of evidence, the prosecution would ultimately seek a capital murder conviction by asserting that the Suburban was stolen, physically altered, and used as part of a premeditated scheme to rob Kenneth Kwan's convenience store.

**C.     The Police Investigation and Photo Identification**

The police were unable to find any physical or forensic evidence connecting anyone with the crime.  On November 20, 1991, Sergeant D.D. Shirley of the City of Houston Police Department placed a photograph of George McFarland in a photo spread that he showed separately to Powell and Bartie. (S.F. Vol. 2 at 10:23-11:7.)  Powell did not pick anyone out of the photo spread.  (Id. at 11:4-7.)  Bartie picked McFarland's photo, but also said that she would like to see the man in the photo in person to be sure that he was the same man who carried the plastic bag.  (Id. at 24:20-23.)  Based solely on what was described as Bartie's "strong tentative" identification, Sergeant W.I. Stephens filed a complaint against McFarland before Judge Mary Bacon six weeks later and obtained an arrest warrant on January 2, 1992.  (Id. at 29:2-18; see Exhibit 3, Complaint and Arrest Warrant.)

---

[1]     There is no indication in the record that either of McFarland's lawyers understood this discrepancy.  See Point One D.1, infra.

[2]     References to the trial transcript and transcript for the hearing on the motion for a new trial are cited as "S.F. Vol. __."

**D.     The Arrest and Line-Up**

On January 3, 1992, McFarland was arrested and placed in a line-up without counsel and without waiving his right to counsel.  Both Powell and Bartie were present for the line-up.  Powell thought McFarland's skin color was closest to the man who carried the plastic bag, but told police that he could not identify anyone in the line-up, including McFarland.  (S.F. Vol. 15 at 77:17-24.)  Although Bartie had previously described the man with the bag as "5'7" to 5'8"," "140 to 150 lbs." with medium brown skin, she picked the 6-foot, 200-pound, dark-skinned McFarland out of the line-up as the man with the bag.  (Exh. 2, Bartie Aff.; S.F. Vol. 2 at 60:12-20.)

**E.     Grand Jury Testimony**

Both Craige Burks, McFarland's nephew, and Walter Burks, Craige's[3] uncle and McFarland's brother-in-law, were called to testify before the grand jury.[4]  Walter appeared before the grand jury on January 10, 1992 and testified that:

- McFarland had told Walter about an incident involving an individual named Charlie White.  (See Exhibit 4, Transcription of Grand Jury Testimony of Walter Burks ("W. Burks Grand Jury Tr."), at 7.)

- McFarland was angry because White had been "running around telling people" that McFarland and two other men – Michael Clark and a man whose name Walter could not remember – were involved in a robbery that had resulted in a death.  (Id. at 7.)

- McFarland told Walter that he and White "had got into it," and that McFarland had "pulled a pistol on Charlie White because he was telling people him, Michael and this other guy ... [were] supposed to have done this robbery."  (Id. at 7-8.)

Walter denied that McFarland had admitted being involved in the Kwan robbery and murder,

---

[3]     We refer to Craige Burks and Walter Burks by their first names to avoid confusion.

[4]     While McFarland's current counsel has seen the transcripts of Walter and Craige Burks' grand jury testimony, we were not permitted to make copies of them.  Citations herein to the grand jury testimony of Walter and Craige Burks are based on counsel's transcriptions of the testimony.

testifying that McFarland had never mentioned having participated in any robbery and that Walter had never heard McFarland telling anyone else that he had committed a robbery. (Id. at 8-9.)

Craige Burks appeared before the grand jury on February 12, 1992 and testified that:

- He had discussed the robbery of the Kwan store with McFarland at Walter's house. (See Exhibit 5, Transcription of Grand Jury Testimony of Craige Burks ("C. Burks Grand Jury Tr."), at 15-16.)

- McFarland made incriminating statements during this conversation to Craige, Walter, and Craige's brother Cedrick, and both Walter and Cedrick heard McFarland make these statements. (Id.)

- Albert Harris was the shooter. (Id. at 15-16, 18.)

## F. Roles of John Benn and Sanford Melamed as Defense Counsel

After McFarland was arrested, he hired John Benn to represent him. Benn had never conducted a voir dire or tried a capital murder case under the new Texas capital murder regime. (E.H. Tr. at 37:5-14, 43:7-17.)[5] On April 3, 1992, the Court on its own motion appointed Sanford Melamed "as a backup" to Benn. Melamed had never participated in a capital murder trial. (See Exhibit 6, Affidavit of Sanford Melamed, sworn to May 16, 1997 ("Melamed Aff."), ¶¶ 4, 18; E.H. Tr. at 6:23-25, 36:7-9.) Melamed was not appointed as, did not consider himself to be, and did not function as Benn's co-counsel. (E.H. Tr. at 12:3-10.) McFarland refused to sign the appointment of counsel form appointing Melamed. (Exh. 6, Melamed Aff., ¶ 6.)

Benn was responsible for the trial strategy and for directing and conducting the defense of McFarland. Melamed, on the other hand, was to have a limited role that did not

---

[5] References to the transcript of the August 15, 2003 evidentiary hearing before the state habeas court are cited as "E.H. Tr. at __."

involve the exercise of independent judgment. For example, Melamed said, "it was made clear to me that I was not to make any decisions in the case without first seeking the approval of Benn and the client." (Id. ¶ 5.) If there was any disagreement between Benn and Melamed on how to proceed, Benn would prevail. (E.H. Tr. at 55:15-16, 55:23-56:2.)

## G. Defense Counsel's Failure to Prepare for Trial or Investigate

Although Benn was responsible for preparing McFarland's defense, he did almost nothing, and never instructed Melamed regarding how the case would proceed. Melamed and Benn had virtually no contact prior to trial (id. at 16:2-11, 34:3-24, 35:10-15, 36:2-6, 37:19-38:3) and never had "any significant substantive conversation about anything" at any point before, during, or after the trial. (Id. at 42:9-11; Exh. 6, Melamed Aff., ¶ 25; see also E.H. Tr. at 37:19-38:3.) They never met to discuss strategy, exchange notes or ideas, divide trial preparation responsibilities, or in any way coordinate their efforts prior to the start of the trial. (E.H. Tr. at 16:2-11, 34:3-24, 35:10-15, 36:2-6, 37:19-38:3, 42:9-11, 67:19-22; S.F. Vol. 22 at 60:8-16.) When trial began, Melamed did not have a "settled idea in [his] mind about how [he was] going to approach the issues in the guilt/innocence phase of the trial." (E.H. Tr. at 47:5-9.)

Benn failed completely to discharge his duty to prepare for trial:

- He relied solely on the State's file. (S.F. Vol. 22 at 58:21-23);

- He did not interview any witnesses. (Id. at 58:13-15);

- He did not attempt to interview or subpoena Walter Burks. (See Exhibit 8, Affidavit of Walter Burks, sworn to November 10, 2005 ("W. Burks Aff."), ¶ 4);

- He never visited the scene of the crime. (S.F. Vol. 22 at 58:8-9);

- He spent just "*three or four hours together*" preparing for McFarland's trial for capital murder. (Id. at 61:14-17 (emphasis added));

- He did not investigate the unadjudicated offenses that were to be offered as aggravating factors in the punishment phase. (S.F. Vol. 22 at 58:10-15, 58:21-23); and

- He did not prepare at all for the punishment phase, despite telling Melamed that he would handle that aspect of trial. (Exh. 6, Melamed Aff., ¶ 26.)

Nonetheless, Benn testified that he felt he had prepared adequately merely by "reading the State's case and briefing a few points of law on evidence." (S.F. Vol. 22 at 58:18-20.) Benn did not subpoena any witnesses because – despite giving no instructions to Melamed – he claimed to have relied on Melamed to do so. (Id. at 60:25-61:2.)

Melamed's trial preparation was similarly deficient:

- He reviewed the State's files and filed some pre-trial motions. (Exh. 6, Melamed Aff., ¶ 9; E.H. Tr. at 17:23-18:9);

- He did not prepare at all for the punishment phase of trial, because Benn had said that he would do so. (Exh. 6, Melamed Aff., ¶ 17; E.H. Tr. at 34:8-14, 35:16-36:1, 83:16-20, 85:20-25, 88:20-89:24);

- Despite having access to the State's file, he never attempted to contact or interview any witnesses, nor did he instruct a private investigator to do so. (S.F. Vol. 22 at 58:13-15; Exh. 6, Melamed Aff., ¶ 12; E.H. Tr. at 60:12-61:23, 92:15-94:2);

- He did not visit the crime scene. (Exh. 6, Melamed Aff., ¶ 11; E.H. Tr. at 92:10-14, 92:25-93:24);

- He did not attempt to interview or subpoena Walter Burks. (Id. at 48:18-49:7; Exh. 8, W. Burks Aff., ¶ 4);

- He did not subpoena Roderick Payton and James Pritchett – the individuals whom McFarland believed could refute testimony regarding unadjudicated offenses. (S.F. Vol. 22 at 46:12-47:20);

- He "attempted to locate and could not find" a list of potential witnesses McFarland provided to him. (Id. at 40:8-9); and

- He made no effort to find the other individuals whom Craige Burks implicated in the Kwan murder. (Exh. 6, Melamed Aff., ¶¶ 9-12).

Melamed admitted after trial that his lack of experience led to his failure to prepare. (See id. ¶ 19 ("Had I participated in a capital case before, perhaps I would have been more skeptical of Benn's lax approach in the months before trial and realized that I was going to be on my own

sooner.").)

## H.    Judicial Proceedings – The Guilt/Innocence Phase of Trial

McFarland's trial began on August 10, 1992 and lasted four days, including the punishment phase.  The State introduced fourteen witnesses and fifty-six exhibits on its direct case in the guilt/innocence phase.  Benn cross examined three of the fourteen witnesses and told Melamed (often after the witnesses had testified on direct) to cross examine the other witnesses, except for the couple of witnesses the defense did not question.  The prosecution rested on August 11.  The defense put on no evidence.  On August 12, 1992, the jury heard closing arguments on the guilt phase and – after deliberating for approximately one hour and twenty minutes – returned a verdict that day finding McFarland guilty of capital murder.

### 1.    Opening Statements

The lead prosecutor, Kate Dolan, began by outlining the State's version of the crime.  (S.F. Vol. 15 at 8:22-10:6.)  According to Dolan, when Kwan and Powell arrived at the store and got out of their truck, McFarland rushed past Kwan, disarmed Powell, then turned and shot Kwan, who was running toward the door.  (Id. at 9:17-10:6.)  McFarland then, according to Dolan, shouted to a second man, who was wearing a mask, and either McFarland or the second man "continued to fire and they took the bag containing the money and they exited the store." (Id. at 10:2-6.)  Finally, she told the jury: "[w]hat you are going to find and hear from the testimony is that George McFarland was the man with the bag.  He was the man who fired the shots, the man who gave orders in this case." (Id. at 10:14-18.)

Benn and Melamed never discussed any strategy for opening statements.  (E.H. Tr. at 67:19-22.)  Benn did not make an opening statement.  Melamed's opening statement consisted of a boilerplate statement about reasonable doubt which takes up 18 lines of the transcript.  (S.F. Vol. 15 at 11:18-12:10.)

### 2.  Benn's Persistent Sleeping During Critical Portions of the Trial

Benn, who was seventy-two years old, slept through substantial portions of the trial.  (See E.H. Tr. at 56:17-57:1, 71:9-72:11.)  Benn admitted that he "customarily [took] a short nap in the afternoon," including during McFarland's trial.  (S.F. Vol. 22 at 59:17-24.)  Melamed noticed Benn "...sleeping a few times during voir dire.  The sleeping would occur after lunch and it grew worse as the days wore on."  (Exh. 6, Melamed Aff., ¶ 22.)  "The problems with respect to Benn's sleeping also seemed to worsen as the trial progressed."  (Id. ¶ 28.)  The "bailiff, David Hernandez, nudg[ed] Benn's chair to keep him awake during the early part of the trial.  The problem worsened to the point that by the end Hernandez stopped nudging him to keep him awake."  (Id. ¶ 28.)  Judge Shaver admonished Benn about his sleeping on "numerous occasions" and the jury thought Benn's sleeping was so "blatant and disgusting" that they discussed it several times.  (See Exhibit 7, Affidavit of Mary Louisa Jensen, sworn to May 17, 1997 ("Jensen Aff."), ¶ 1.)  By the end of the trial, Melamed "stopped making any attempt to keep Benn awake."  (Exh. 6, Melamed Aff., ¶ 28.)

Because Melamed's role was subordinate to Benn, he understood that he was not to make any independent decisions about the conduct of the trial, and he, in fact, did not .  (Id. ¶ 5.)  Melamed did not feel that it was "his place" to raise his concerns about Benn's sleeping with the Court, with Benn, or with McFarland.  (E.H. Tr. at 42:18-22, 44:10-16, 45:2-14, 58:2-25, 69:8-10, 81:10-82:7.)

Because Benn had told Melamed prior to the trial that he would handle McFarland's mitigation case if McFarland were convicted (Exh. 6, Melamed Aff., ¶ 17; E.H. Tr. at 34:8-14, 35:16-36:1, 85:20-26, 88:20-89:24), Melamed did nothing to prepare for the punishment phase.  (Exh. 6, Melamed Aff., ¶ 17; E.H. Tr. at 83:16-20, 87:15-25.)  However, as Benn slept through more and more of the proceedings, Melamed began to realize that he "was on

[his] own by the punishment phase of the trial." (Exh. 6, Melamed Aff., ¶ 26.) But because the guilt/innocence phase of the trial lasted only two and a half days, by the time Melamed realized that he "was on his own," he had no time to prepare for the punishment phase. (Exh. 6, Melamed Aff., ¶ 26; E.H. Tr. at 83:16-84:5, 90:9-91:13.)

### 3.    Lack of Preparation for Cross Examination

Benn's and Melamed's failure to communicate continued once the trial began. They did not discuss either how the trial was proceeding or strategy for the next day. (E.H. Tr. at 37:19-38:3, 57:2-4, 59:1-18, 67:3-25.) Benn, without any input from Melamed, decided who would cross examine each witness, often not telling Melamed who would be cross examining a witness until after the completion of that witness' direct testimony. (Exh. 6, Melamed Aff., ¶ 27.) Benn and Melamed did not compare notes on the witnesses. (S.F. Vol. 22 at 60:14-16.) Benn and Melamed had no strategy.

### 4.    Testimony Regarding the Chevrolet Suburban

#### a)    Testimony of Police Officer H.C. Jordan

Officer Jordan testified that when he arrived at the 2800 block of McDaniel Street he "met with an Officer Clark who was assigned to the northeast police station. He was standing by a vehicle that [he] *was told* had been used in the crime on Bennington." (S.F. Vol. 15 at 28:5-9 (emphasis added).) The defense did not object either to Jordan's hearsay testimony connecting the Suburban to the shooting and robbery or when the State introduced a series of photographs of that vehicle. Jordan also testified that a shotgun was found in the back of the Suburban and a photograph of the shotgun was admitted, again without objection. (Id. at 35:18-36:14.)

#### b)    Testimony of James L. Powell

The defense allowed the prosecution to lead Powell through the prosecution's version of events, with no meaningful challenge. The defense never attempted to challenge

Powell's identification of the gun, which is the only piece of physical evidence that allegedly linked the grey Suburban to the shooting at Kwan's store. (S.F. Vol. 15 at 48:25-49:10.)

Without any objection by the defense, the prosecution attempted to impeach Powell with his prior statement to the police, and substituted it for his direct testimony. (Id. at 65:23-66:25.) The prosecutor directed Powell to read this portion of his statement – "I then saw the man with the pistol that shot Ken and the man that was carrying the bag get in a *Blazer. I didn't see what color it was*." (Id. at 73:19-21 (emphasis added).) Without challenge from the defense, the prosecutor asked, "You say the *grey Suburban* left the area?" (Id. at 75:2 (emphasis added).) Benn and Melamed never challenged the police theory that the Suburban found on McDaniel was the getaway car – even though no competent evidence leads to that conclusion and Powell testified that the getaway car was a Blazer, not a Suburban. During cross examination, Melamed did not focus on the fact that Powell did not say that the man with the leaves (i.e., McFarland, according to the prosecution's theory) did the shooting. He also adopted the prosecution's theory that the Suburban found on McDaniel Street was the getaway car. For example, despite the fact that Powell described the car as a Blazer, Melamed said "Did you see in the Suburban that drove off, did you see how many men were in there?" (Id. at 81:20-21.)

c)    Testimony of Officer Todd Miller

Officer Miller was involved in the investigation of the 1986 Suburban. The principal purpose of his testimony was to show that the Suburban had been stolen from the Kingswood Section of Houston and that it carried license plates that had been stolen from another 1986 Suburban located in the same part of Houston. He did not specify on direct, and was not asked on cross, when those thefts occurred.

After one question on cross examination by Benn, to which Officer Miller responded that he had no evidence that McFarland stole the car, the following exchange took

place on redirect:

> Q:   Officer, Did you find in your examination of the vehicle that you found abandoned in the street if there had been any alterations of it by whoever took it?
> A:   Yes I did.
> Q:   What was the alteration?
> A:   Somebody put window tinting on the front driver's side door window and the front passenger's side door window.

(Id. at 90:17-25.)  Benn did not object to this testimony, even though it was clearly improper redirect because it was beyond both the scope of the original direct examination and the cross examination. Sims v. Brackett, 885 S.W.2d 450, 455 (Tex. App. – Corpus Christi 1994); Rogers v. State, 815 S.W.2d 811, 816 (Tex. App. – Amarillo 1991.)  Nor did Benn object to the assumption contained in the first question that "whoever took it" had altered the vehicle.

### 5.    Testimony of Craige Burks

Craige testified that, on November 15, 1991, McFarland confessed to his involvement in the Kwan murder.  But the story Craige told at trial differed in material respects from the story he told the grand jury regarding (1) where and when he heard McFarland's alleged confession, (2) his motivation for coming forward, and (3) the particulars of what McFarland allegedly said (including whether McFarland had allegedly confessed to shooting Kwan), none of which the defense brought to the jury's attention despite having access to a transcript of Craige's grand jury testimony.  (See Exh. 6, Melamed Aff., ¶ 10.)

Craige's story at trial, which the prosecutor directed him to tell through leading questions, was that:

- Several weeks before the Kwan shooting, Michael Clark had driven Craige past Kwan's convenience store and pointed it out to him.  (S.F. Vol. 15 at 126:25-128:7.)

- On November 15, Craige saw a television news report about the Kwan shooting. (Id. at 129:8-13.)

- That evening, McFarland, who was Craige's uncle, came by Craige's house and Craige, his brother Cedrick and his uncle Walter went riding with George in a silver Park Avenue which Craige had never seen before. (Id. at 129:23-130:25.)

- During the ride, McFarland told them "[h]ow he robbed the Chinese guy. He pulled a pistol on a security guard and shot the dude, the Chinese guy." (Id. at 131:18-132:1.)

- McFarland said that he did not shoot Kwan. Instead, he "said Albert was the only one fired his gun." (Id. at 135:15-17.)

- Craige called Crime Stoppers three days after his car ride with McFarland. (Id. at 135:18-136:1.)

- Craige was presently in jail on an unrelated aggravated robbery charge, and that he had been offered a reduction in that charge to simple robbery with a five year sentence in exchange for his testimony. (Id. at 138:1-19.)

Melamed's cross examination of Craige failed to raise several key issues. Although Melamed asked Craige about his plea bargain, he never established that Craige had reduced his sentence from the possibility of more than 30 years to five years. (Id. at 155:24-158:1.) In addition, although Craige testified that his uncle Walter and brother Cedrick were in the car with Craige and McFarland when McFarland allegedly confessed, Melamed never called Walter to the stand to confirm or deny Craige's story. (Id. at 148:22-149:15; S.F. Vol. 22 at 48:18-49:7; E.H. Tr. at 63:23-64:2.) This is particularly troubling because Walter told the grand jury that McFarland had *not* admitted to being involved in the Kwan murder. (Exh. 4, W. Burks Grand Jury Tr. at 8; see also Exh. 8, W. Burks Aff., ¶¶ 2, 4.)[6] Melamed never confronted Craige with this critical evidence.

Melamed also never confronted Craige with his grand jury testimony where

- He first said that he had not been promised anything nor threatened with anything, but then said that he had tried to enter into a deal with the prosecution for his

---

[6] Pursuant to Rule 7(b) of the Rules Governing Section 2254 Cases in the United States District Courts (the "Section 2254 Rules"), the Court may consider Walter Burks' affidavit as part of the record. Rules Governing § 2254 Cases, Rule 7(b), 28 U.S.C. foll. § 2254.

freedom in exchange for wearing a wire with McFarland. (Exh. 4, W. Burks Grand Jury Tr. at 4-5.);

- He testified that McFarland had told him, Cedrick and Walter in Walter's *house*, not in a car, that *Harris, not McFarland,* had shot Kwan during the course of the robbery. (Id. at 15-16, 18.); and

- He implicated Michael Clark and Albert Harris in the Kwan murder. (Id. at 12-15.)

After the trial, Craige Burks admitted that he never talked with McFarland "prior to the date of [his] testimony regarding the murder of Kenneth Kwan or the November 15, 1991 robbery of the C & Y Food Center located at 3219 Bennington, in Houston, Texas." (See Exhibit 9, Affidavit of Craige Burks, sworn to April 24, 1997 ("C. Burks Aff."), ¶ 2.) He also admitted that he had "never called Crime Stoppers or any other confidential informant line associated with the City of Houston Police Department or any other law enforcement agency for the purposes of implicating any person, including George McFarland, in the robbery of Mr. Kwan's store." (Id. ¶ 3.)

Craige's post-trial affidavit describes the "numerous visits" by the police and the prosecution to his mother's house and to the jail where Craige was incarcerated in order to secure his trial testimony. (See id. ¶ 6.) Because Benn and Melamed never tried to contact Craige Burks before trial and because they never confronted Craige with his grand jury testimony on cross examination, they never found out what Craige was willing to say outside of the presence of police and the prosecution, or how they could have easily impeached his credibility on cross examination.

### 6. Testimony Regarding the Alleged Crime Stoppers Call

Officer Bill Stephens' testimony violated the trial court's order that neither the information obtained through Crime Stoppers nor its source could be revealed to the jury. (S.F. Vol. 2, 109:4-14.) Stephens first testified that Craige Burks had called Crime Stoppers:

> Q:    Did you receive information through the Crime Stoppers program in this case?
> A:    Yes.
> Q:    Did the individual who reported through that program ultimately come forward and meet with you and the detectives in this case?
> A:    Yes ma'am, Craig [sic] Burks.

(S.F. Vol. 15 at 97:22-98:3.) Stephens also testified that "We had gone back to the scene to do more investigation and had gotten paged by Crime Stoppers and called them and they gave us the phone number and I called that phone number and spoke to Craige Burks on the phone." (<u>Id.</u> at 98:12-16.) The defense did not object to either the violation of the court's order or to Stephens' foundationless identification of Craige.

Stephens also testified to additional hearsay that allowed the prosecution to anticipatorily bolster Craige's credibility as follows:

> Q:    As you cleaned up your investigation at the scene and they are attempting to report the news, do you withhold information from the media in an attempt to continue your investigation without getting calls from people reporting things that come out of the newspapers?
> A:    Yes.
>       *                    *                    *
> Q:    Did you find – without going into detail of what he told you, was he [Craige] able to relay information to you that would not have been known from the media?
> A:    Yes.

(<u>Id.</u> at 98:23-99:4, 100:8-12.)

On cross examination, Melamed apparently forgot the defense's motion <u>in limine</u> when he twice asked Stephens to repeat the Crime Stoppers information:

> Q:    Help me out a little bit. Did I understand you to tell us that you received some information from Crime Stoppers that a couple of guys named Harris and Clark were involved in this thing?
> A:    No sir, it was George McFarland and Albert Harris and Michael Clark.

Q:      So you did receive information from somebody, an
        anonymous person, that a guy named Clark and a guy
        named Harris were involved in this?
A:      As well as McFarland.

(Id. at 115:15-116:1.)

### 7.     Testimony of Carolyn Bartie

When Bartie testified, she told essentially the same story that she did on the day

of the crime – namely, that the man with the bag of leaves crossed in front of her, passed Mr.

Kwan, grabbed the security guard, and while holding the security guard, turned and shot at Mr.

Kwan.  However, at trial she said that Mr. Kwan was *inside* the store before the shooting began

and that the shooter, i.e., the man with the bag who was holding the security guard, fired

"straight into the door that was closed."  (S.F. Vol. 16 at 240:5-25, 241:9-11, 242:24.)  After she

saw the shooter fire into the door of the store, Bartie ducked down in her car.  (Id. at 243:23-

244:6.)  She heard the shooter yell at a man behind him to "Grab the bag, grab the bag."  (Id.)

Bartie described the photo lineup and the live lineup, and then identified McFarland as the man

who had been carrying the plastic bag, who held Mr. Powell while shooting at the store.  (Id. at

256:2-257:15, 261:20-264:16.)

Although Benn confronted Bartie on cross examination with her statement that "it

all happened so fast that I don't think I will be able to identify either one of the guys who robbed

the store," he did not ask her about her description in that same statement of the shooter as being

about 5'7", 140 pounds, and "medium brown skinned."  (Exh. 2, Bartie Aff.)  Melamed's notes,

which he had with him in the courtroom, reflect that he was aware of the discrepancies in

Bartie's description and identification of the shooter.  (E.H. Tr. at 98:20-100:7; see Exhibit 10,

Defendant's Exhibit 1 from August 15, 2003 evidentiary hearing) ("Melamed's Trial Notes").)

However, Melamed did nothing to call this discrepancy to the jury's attention or to confront

Bartie with it because it was not his "place" to do so and because he was not there to "second-guess" Benn. (E.H. Tr. at 80:10-82:7.)

The prosecution rested at the conclusion of Bartie's testimony and the defense, without offering any evidence, rested immediately thereafter. The jury convicted McFarland of capital murder in less than two hours.

## I.     Judicial Proceedings – The Punishment Phase

Prior to the start of the guilt/innocence phase of the trial, Benn told Melamed that he would handle the punishment phase. However, Benn did nothing to prepare. Among other things, he failed to:

- Make arrangements for certain of McFarland's relatives, who were living in New York, to testify on McFarland's behalf. (E.H. Tr. at 83:22-84:5);

- Investigate any of McFarland's prior convictions or the unadjudicated offenses the State was certain to raise. (S.F. Vol. 22 at 58:10-23);

- Contact the witnesses McFarland said had potential exculpatory evidence relating to the unadjudicated offenses. (S.F. Vol. 22 at 27:14-28:1); and

- Return phone calls from Richard Frankoff, the lawyer who had formerly represented McFarland, and had known him for 8 years, who was prepared to testify that he knew McFarland to be "friendly and agreeable," not a "violent man" and that that he "believe[d] [McFarland's] life is one that is capable of being redeemed." (See Exhibit 11, Affidavit of Richard Frankoff, sworn to May 19, 1997 ("Frankoff Aff."), ¶¶ 4-9.) Frankoff was also prepared to testify to specific facts in mitigation of McFarland's prior convictions. (Id. ¶¶ 8-9.)

Melamed did not prepare for the punishment phase before the trial began. As the two and a half day trial proceeded, Benn's sleeping increased. Melamed did not realize that "Benn was going to basically do nothing at trial" until after Bartie, the last witness during the guilt phase, testified. (Exh. 6, Melamed Aff., ¶ 26.) So while Melamed knew "by the punishment phase of the trial," that he "was on [his] own," by that time, it was too late to investigate or prepare for the punishment phase. (Id. ¶¶ 17 & 29; Exh. 11, Frankoff Aff., ¶¶ 4-7;

E.H. Tr. at 83:16-84:5, 87:15-25, 90:9-91:13; see S.F. Vol. 22 at 40:5-20, 45:2-47:20, 59:9-16.)

The punishment phase of the trial began immediately after McFarland was convicted and continued into the next day. The State presented eighteen witnesses and introduced twelve exhibits on its direct case, including evidence of McFarland's prior convictions, including a 1984 robbery, and of McFarland's alleged involvement in a robbery at a Wal-Mart store. Benn, whose sleeping was at its worst during the punishment phase, did not cross examine a single witness, and Melamed, who had not prepared at all for that phase of trial, cross examined ten of the eighteen prosecution witnesses.

The defense provided only fifteen minutes of testimony in the punishment phase, beginning at 3:15 p.m. and resting at 3:30 p.m. on August 13, 1992. (See Exhibit 12, General Orders of the Court.) The first witness was the custodian of records for the Harris County Jail, who testified that McFarland had not been involved in any disciplinary incidents since being taken into custody for the Kwan murder. (S.F. Vol. 19 at 174:9-12.) The next witness was a supervisor at a paper company who testified that McFarland was a "good worker" when he worked at the company from 1979 to 1982 and then, after being rehired, from 1989 to 1990. (Id. at 177:25-179:6.) McFarland's wife, Patricia, testified that McFarland was good to her and always tried to take care of her. (Id. at 182:7-12.)

On August 14, 1992, the charge was presented and each side made closing arguments. Benn argued in closing:

> Honorable Judge, Mr. Prosecutor, ladies and gentlemen of the jury panel: I'm not going to keep you very long because you have heard all the evidence and the arguments of my able co-counsel. And I don't believe my oratory would change the way you think to any degree, but Mr. Kwan is dead. If we could exchange George's life for his, I would say all right, but killing one man is not going to bring back the life of another man. Eye for an eye, a tooth for a tooth went out of civilized religion a long time ago. It is not going

to help the State or anyone for you to kill George McFarland.
Thank you.

(S.F. Vol. 20 at 26:1-13.)  The jury deliberated on punishment for less than four hours before

answering each of three special issues presented in favor of the death penalty.  (See Exh. 12,

General Orders of the Court.)

## J.   Judicial Proceedings – Motion for a New Trial

Marcelyn Curry, McFarland's appellate counsel, filed a Motion for a New Trial

on September 14, 1992, and the trial court held a hearing on the motion on October 26, 1992.

Curry called six witnesses in a cursory effort to show that Benn and Melamed had provided

McFarland with ineffective assistance of counsel at trial:

- Roderick Payton testified that he had informed McFarland prior to trial that a James Pritchett and William Bonaparte had actually committed the Wal-Mart robbery and that neither Benn nor Melamed had ever contacted him, despite the fact that police alleged Payton and McFarland committed the crime together. (S.F. Vol. 22 at 7:24-8:25);

- Pritchett testified that Benn and Melamed had not contacted him either concerning the Wal-Mart robbery. (Id. at 13:2-10);

- Patricia McFarland testified that she had told Benn and Melamed before trial that Payton and Pritchett were possible suspects in the Wal-Mart robbery, and asked them to investigate the matter. (Id. at 18:24-16:2);

- George McFarland testified that prior to trial he had asked his counsel to subpoena Payton, Pritchett and Bonaparte and also to subpoena Walter Burks, whom he knew to have testified before the grand jury. (Id. at 24:17-25:2, 26:1-13) McFarland also testified to Benn's sleeping at trial. (Id. at 29:7-9);

- Melamed admitted that he had not communicated with Benn concerning their respective responsibilities in the case and that he had been appointed merely "to assist" Benn, with the understanding that Benn would be lead counsel. (Id. at 41:3-15) Melamed also testified to Benn's sleeping at trial. (Id. at 55:20-23); and

- Benn admitted to sleeping during trial and, when asked why he had slept through much of his client's trial, Benn replied, "I'm 72 years old.  I customarily take a short nap during the afternoon." (Id. at 59:19-20)  Benn also testified that he did not warn McFarland of his propensity for sleeping. (Id. at 59:21-23.)

Testimony in the hearing on the motion for a new trial lasted for little more than an hour. (See Exh. 12, General Orders of the Court.) After brief closing arguments by both sides, the trial court denied the motion. (Id.)

## K.    Defects in McFarland's Underlying Appeal

Curry also handled McFarland's direct appeal to the Texas Court of Criminal Appeals. After the court denied Curry's fourth motion to extend the time to file her appellate brief, she missed the filing deadline, and the Court of Criminal Appeals ordered her to show cause why she should not be held in contempt. In response, Curry asserted that she was both physically and mentally unable to file a brief for McFarland in the time allotted to her, detailed her numerous debilitating medical conditions, emotional problems, and familial obligations, and argued that she should nevertheless be permitted to continue as McFarland's appellate counsel because the brief gave her "an opportunity to establish [her]self into an area of the law where [she] could work from [her] bed and remain self-sufficient." (See Exhibit 13, Affidavit of Marcelyn Curry, sworn to July 1, 1993 ("Curry Aff."), at 4.)

Curry eventually submitted an appellate brief that did no more than reiterate what had happened at trial. The Texas Court of Criminal Appeals denied McFarland's appeal on February 21, 1996.

## L.    The State Habeas Proceedings

George McFarland filed his original application for writ of habeas corpus on May 21, 1997, which was amended on August 19, 1997, pursuant to court order.[7] The State filed its answer on September 29, 2000, more than three years later.

---

[7]    The trial court's order, dated August 14, 1997, provided that, among other things, all proceedings would be stayed from May 21, 1997 until McFarland's supplemental petition was filed on August 19, 1997. (See Exhibit 14, Order dated August 14, 1997.)

Two and a half years later, on February 28, 2003, the State moved the trial court to determine that no factual issues remained controverted and unresolved and to order the submission of proposed findings of fact and conclusions of law under Tex. Code Crim. Proc. Ann. art. 11.071 § 8 (Vernon 2002). McFarland opposed the motion and cross-moved for an evidentiary hearing.[8]

On August 15, 2003, the trial court held an evidentiary hearing, but limited the hearing to testimony of a single witness – Sanford Melamed. McFarland and the State submitted proposed findings of fact and conclusions of law to the trial court on October 1, 2003. On June 8, 2004, the trial court issued its order (the "Findings of Fact and Conclusions of Law"), adopting verbatim the State's proposed findings of fact and conclusions of law.[9]

On November 17, 2004, the Texas Court of Criminal Appeals entered an order setting McFarland's claims that he was denied effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution for submission, and indicating that the court would affirm the trial court's findings as to the other grounds set forth in McFarland's petition. McFarland submitted his Supplemental Memorandum of Law in Support of Application for Writ of Habeas Corpus on December 17, 2004. The State responded on January

---

[8]    The issues raised included, among others: (1) the extent of Benn's unconsciousness at trial; (2) the nature of Benn's relationship to Michael Clark; (3) the nature of Benn's medical condition; (4) the full extent to which Melamed was compromised by virtue of being Benn's subordinate; (5) the extent of Melamed's lack of preparation; (6) the unreliability of Carolyn Bartie's testimony; (7) the unreliability of Craige Burks' testimony; and (8) the extent of any Brady violations.

[9]    The trial court deleted two paragraphs from the State's proposed findings and conclusions relating to testimony allegedly provided by Craige Burks in 2003 in the form of two affidavits. (Trial Court's Findings of Fact and Conclusions of Law at 20-21.) The affidavits, which were not previously disclosed to McFarland or the trial court, were submitted along with the State's proposed findings of fact and conclusions of law. Based on the fact that, among other things, the affidavits were improperly obtained and not credible, see Point Three.A.1, infra, McFarland filed a motion on October 29, 2003 asking the trial court to strike the affidavits and the related proposed findings of fact. The State did not file a response. Although the docket does not appear to contain a formal order, the court's determination to strike those findings suggests that the motion was granted.

21, 2005. On May 18, 2005, the Court of Criminal Appeals issued its Opinion and Order affirming the denial of McFarland's petition for state habeas relief. Ex parte McFarland, 163 S.W.3d 743 (Tex. Crim. App. 2005). Essentially, the court concluded that Benn had failed to provide McFarland with constitutionally acceptable counsel, but that the presence of Melamed rendered Benn's failures harmless. Id. at 752-53.

## ARGUMENT

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal writ of habeas corpus shall be granted if a state court decision was "contrary to, or involved an unreasonable application of, clearly established" precedents of the U.S. Supreme Court. 28 U.S.C. § 2254(d)(1). The "unreasonable application" standard requires that the writ be granted when a state court identifies the correct governing legal principle, but unreasonably applies it to the facts of a petitioner's case. Williams v. Taylor, 529 U.S. 362, 413 (2000). In addition, habeas relief must be granted when the state court's adjudication of a petitioner's claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 551 (2003); 28 U.S.C. § 2254(d)(2). As demonstrated below, each of these provisions entitles McFarland to habeas relief.

## POINT ONE

**THE COURT OF CRIMINAL APPEALS' DECISION WAS CONTRARY TO, AND AN UNREASONABLE APPLICATION OF, THE SUPREME COURT'S DECISION IN UNITED STATES v. CRONIC BECAUSE BENN'S SLEEPING DEPRIVED MCFARLAND OF HIS RIGHT TO COUNSEL GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

**A.      The Standard for Determining Sixth Amendment Violations Under Cronic.**

A defendant's Sixth Amendment rights are violated (1) if he "is denied counsel at a critical stage of his trial," (2) if the circumstances surrounding the trial are such that it is

unlikely that counsel could render effective assistance, or (3) if counsel "fails to subject the prosecution's case to meaningful adversarial testing." United States v. Cronic, 466 U.S. 648, 659 (1984); Bell v. Cone, 535 U.S. 685, 695-96 (2002). Under Cronic, a defendant does not have to show that these failures of counsel prejudiced his right to a fair trial -- prejudice is presumed. Cronic, 466 U.S. at 659. Here, McFarland was deprived of his right to counsel under all three of the Cronic tests. The Texas Court of Criminal Appeals' decision denying relief was therefore "contrary to" *and* "involved an unreasonable application of, clearly established Federal law" within the meaning of Section 2254(d)(1). Williams, 529 U.S. at 399; 28 U.S.C. § 2254(d)(1).

**B.      Benn's Sleeping Denied McFarland of Counsel at a Critical Stage of His Trial.**

It is now clearly established that "[u]nconscious counsel equates to no counsel at all" because an "unconscious attorney does not, indeed cannot, perform at all." Burdine v. Johnson , 262 F.3d 336, 349 (5th Cir. 2001); see also Tippins v. Walker, 77 F.3d 682, 685 (2d Cir. 1996) ("[S]leeping counsel is tantamount to no counsel at all."); Javor v. United States, 724 F.2d 831, 834 (9th Cir. 1984) ("Prejudice is inherent in this case because unconscious or sleeping counsel is equivalent to no counsel at all."). This case represents an even clearer instance of denial of counsel than those precedents. Here, there is no dispute that Benn "slept during great portions of the" trial and that Benn's sleeping problem actually "worsen[ed] as the trial progressed." (Exh. 7, Jensen Aff., ¶ 1; Exh. 6, Melamed Aff., ¶ 28.)[10] The Texas Court of Criminal Appeals has expressly "agree[d] that [McFarland] did not have Mr. Benn's active assistance during his postprandial naps and that those naps occurred during 'critical stages' of his

---

[10]      See also John Makeig, Asleep on the Job?: Slaying Trial Boring, Lawyer Says, Houston Chronicle, Aug. 14, 1992, at 35A ("Benn seems to have slept his way through virtually the entire trial.").