United States District Court
Southern District of Texas

**ENTERED**
April 02, 2019
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT          SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| George E. McFarland, | § | |
| | § | |
| Petitioner, | § | |
| | § | Civil Action H-05-3916 |
| versus | § | |
| | § | |
| Lorie Davis,[1] | § | |
| | § | |
| Respondent. | § | |

## Opinion Denying a Writ of Habeas Corpus

The State of Texas plans to kill George E. McFarland for murdering Kenneth Kwan during a robbery. McFarland has petitioned for a writ of habeas corpus. Respondent has filed an answer. McFarland's petition will be denied. No issue will be certified for appeal.

1.    *The crime and trial.*

In November 1991, Kwan and a security guard, James Powell, returned to Kwan's grocery store after withdrawing $27,000 from the bank to cash customers' payroll checks. Armed men approached them. As Kwan entered the store, gunshots erupted. One man followed Kwan inside, shot him twice, and took the bag of money.

Four days later, McFarland's nephew, Craige Burks, called Crime Stoppers and said that McFarland admitted to committing the Kwan robbery. An eyewitness, Carolyn Bartie, tentatively identified McFarland in a photographic lineup as one of the gunmen. She made a stronger identification in a later live lineup.

The State of Texas charged McFarland with capital murder. McFarland hired 72-year-old John Benn to represent him. Benn had not tried a capital case in two decades. He had no capital voir dire experience.

---

[1]    Lorie Davis is the current director of Texas Department of Criminal Justice, Correctional Institutions Division. She is automatically substituted as a party. Fed. R. Civ. P. 25(d).

1

The trial court "recognized that Mr. Benn – although he was clearly the sole attorney [McFarland] wanted – was elderly and unprepared to try a capital murder case."[2]  The trial court repeatedly asked McFarland if he wished to continue with Benn as lead counsel. McFarland kept Benn.

Thus, the trial judge "was caught between Scylla and Charybdis.  On the one hand, he could foresee that Mr. Benn might not provide reasonably competent representation, and, under the Sixth Amendment, a criminal defendant is entitled to competent representation."  "On the other hand, a criminal defendant also has a Sixth Amendment right to the privately retained counsel of his choice, and a trial judge may not unilaterally remove a defendant's retained attorney without extraordinarily good cause."[3]

The trial judge "did his best to satisfy both of these constitutional requirements: he appointed an experienced and competent co-counsel [Sanford Melamed] to assist Mr. Benn and take over as necessary."[4]  Melamed was not a novice.  In his fourteen years of practice he had been counsel in over 600 felony cases and taken around thirty to trial.  Also, he had never represented a capital defendant.

Melamed was not accepted as part of the defense team.  McFarland did not consent to Melamed's appointment.  Benn refused to coordinate with Melamed on trial strategy. Melamed raised his concerns about Benn with the trial judge.  The trial judge gave Melamed two charges: Melamed would follow Benn's lead in trial preparation, but Melamed was also to assume that Benn would do nothing.  The trial court directed Melamed to be ready to try the case himself.

The guilt-innocence and penalty phases lasted five days.  Benn slept during trial. According to Melamed, Benn was conscious during most of jury selection but often slept during trial questioning.  The bailiff initially nudged Benn's chair to rouse him but soon gave up.  Benn's sleeping was obvious to the entire courtroom.

No one disputes that only two witnesses linked McFarland to the murder: (1) Craige Burks' testimony that McFarland admitted to participating in the robbery-murder, and (2) eyewitness Carolyn Elizabeth Bartie's identification.  The prosecution's closing argument emphasized that Craige Burks' and Bartie's testimony were "the critical part of the State's evidence in this case."[5]  No forensic evidence, surveillance footage, co-conspirator testimony, or other traditional inculpatory category of evidence existed that could connect McFarland to the offense.

---

[2]     *Ex parte McFarland*, 163 S.W.3d 743, 759-60 (Tex. Crim. App. 2005).
[3]     *Id.*
[4]     *Id.*
[5]     Tr. Vol. 17 at 48.

2

Melamed cross-examined all but three of the State's witnesses. The defense did not call any guilt-innocence witnesses. The jury instructions allowed for McFarland's conviction as the shooter or as a party to the murder.

The jury convicted McFarland of capital murder.

A capital defendant's sentence is decided by the jury's answers to special issue questions in a separate punishment hearing. The State presented penalty phase testimony showing that McFarland had committed several offenses, including other armed robberies. McFarland's commission of an armed robbery involving Wal-Mart employees returning from the bank was remarkably similar to the Kwan robbery.

The defense only called three witnesses in the punishment phase – a prison guard, McFarland's wife, and a former employer. The defense's punishment case lasted fifteen minutes. McFarland was sentenced to death.

Newly appointed appellate counsel moved for a new trial, based in part on the ineffective assistance of McFarland's trial attorneys. Benn and Melamed testified at a hearing on the motion. Benn confessed to sleeping and explained that "reading the state's case and briefing a few points of law on evidence" was sufficient trial preparation.[6] Melamed outlined efforts he had made before trial and conceded some things he could have done better. Melamed said that he had been ready to try the case without Benn's assistance.

2.    *Appeal and collateral attack.*

McFarland unsuccessfully challenged his conviction and sentence by direct appeal to the court of criminal appeals. He raised several issues, including an ineffective-assistance claim based on Benn's sleeping. The court of criminal appeals affirmed his conviction and sentence.[7]

In 1997, McFarland filed a state application for habeas corpus relief. Among other issues, McFarland renewed his ineffective-assistance-of-counsel claim. The state habeas court held an evidentiary hearing in which Melamed provided detailed testimony about the trial defense. The state habeas court entered proposed findings of fact and conclusions of law recommending that the appellate court deny relief.

The court of criminal appeals adopted most of the lower court's recommendations. Because the Fifth Circuit Court of Appeals had recently decided a case finding that a sleeping lawyer may constitute the constructive denial of counsel,[8] the court of criminal appeals set

---

[6]    Tr. Vol. 22 at 58.

[7]    *McFarland v. State*, 928 S.W.2d 482 (Tex. Crim. App. 1996).

[8]    *Burdine v. Johnson*, 262 F.3d 336 (2001) (en banc).

3

McFarland's appeal for submission to reconsider the ineffective-assistance claim. The court of criminal appeals denied habeas relief.[9]

3.     *The federal petition.*
        After exhausting state remedies, McFarland now seeks a federal writ of habeas corpus. He raises six claims:

> A.     Benn's sleeping actually and presumptively denied McFarland legal representation.
> B.     Both attorneys performed below constitutional standards resulting in actual prejudice.
> C.     The prosecution withheld evidence.
> D.     McFarland should have had an attorney at a police lineup.
> E.     The trial court should have given different jury instructions.
> F.     The prosecution should have been required to prove beyond a reasonable doubt the unadjudicated offenses at the punishment phase.

4.     *The role of the court.*
        The writ of habeas corpus is an exceptional writ. Since before the Constitution in 1789, the writ has protected individuals from wrongful punishment. The writ allows individuals to challenge their custody on the grounds that their conviction and sentence violate federal law sufficient to be a gross miscarriage of justice.
        Federal courts and Congress "adjust the scope of the writ in accordance with equitable and prudential considerations."[10] Principles of comity, finality, and federalism demand that federal courts defer to state court judgments. Congress enacted the Anti-Terrorism and Effective Death Penalty Act of 1996 to support the State's interest in the integrity of criminal judgments. AEDPA limits what a federal court may consider and how it reviews a state court decision.
        AEDPA gives state courts the first opportunity to correct constitutional violations, and prevents federal courts from granting the writ on the basis of claims, arguments, and evidence presented for the first time in a federal petition. Federal courts focus on "what a state court knew and did[.]"[11]
        AEDPA requires significant federal deference when the state courts decide the merits of an inmate's constitutional arguments. An inmate may only secure relief after showing that the state court's rejection of his claim was either "*contrary to,* or involved an *unreasonable*

---

9     *Ex parte McFarland,* 163 S.W.3d 743 (Tex. Crim. App. 2005).
10    *Danforth v. Minnesota,* 552 U.S. 264, 279 (2008).
11    *Cullen v. Pinholster,* 563 U.S. 170, 182 (2011).

*application of,* clearly established Federal law, as determined by the Supreme Court of the United States."[12] A decision is contrary to Supreme Court law when "it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [that] Court but reaches a different result."[13]

An unreasonable application of Supreme Court precedent is different from an incorrect one. AEDPA does not permit federal habeas relief for an erroneous decision, but only one that is objectively unreasonable. "[F]ocus[ing] on what a state court knew and did,"[14] an inmate must show that the state ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."[15] This deference confines habeas relief to "extreme malfunctions in the state criminal justice systems."[16] "If this standard is difficult to meet, that is because it was meant to be."[17]

McFarland has not met the AEDPA standard for granting the writ.

5.   *Constitutional standards for legal representation.*

McFarland complains that his attorneys provided constitutionally ineffective assistance. Two standards govern claims of constitutionally deficient criminal representation. In cases when counsel's assistance was equivalent to having no attorney, prejudice is presumed under *United States v. Cronic.*[18] In most cases, however, a petitioner must show both deficient performance and actual prejudice under *Strickland v. Washington.*[19]

In claim one, McFarland says that Benn's sleeping, combined with Melamed's inexperience and lack of preparation, deprived him of representation under *Cronic.* In claim two, McFarland argues under *Strickland* that his attorneys provided deficient performance that prejudiced the defense.

6.   *Cronic.*

McFarland says Benn's sleeping denied him legal representation. While the trial transcript does not show when Benn dozed, no one disputes that Benn's sleeping was

---

[12]   28 U.S.C. § 2254(d)(1)(emphasis added).
[13]   *Brown v. Payton,* 544 U.S. 133, 141 (2005).
[14]   *Pinholster,* 563 U.S. at 182.
[15]   *White v. Woodall,* 572 U.S. 415, 420 (2014) (quotation omitted); *see also Berghuis v. Thompkins,* 560 U.S. 370, 380 (2010); *Williams v. Taylor,* 529 U.S. 362, 413 (2000).
[16]   *Greene v. Fisher,* 565 U.S. 34, 38 (2011).
[17]   *Richter,* 562 U.S. at 102.
[18]   466 U.S. 648 (1984).
[19]   466 U.S. 668 (1984).

pronounced, obvious, and frequent.  Drawing comparison to *Burdine v. Johnson*,[20] the infamous "sleeping lawyer" case, McFarland contends that having a napping attorney was like having no attorney at all.

The Constitution's guarantee of an effective attorney presumes one who is awake. Sleeping-lawyer claims may fall under *Cronic*.  The court of criminal appeals, however, found that, *Cronic* did not apply because "Mr. Benn was not [McFarland's] sole attorney."[21]

The court of criminal appeals' decision was not unreasonable.  There is no "per se rule that any dozing by defense counsel during trial merits a presumption of prejudice,"[22] particularly when more than one attorney represents a defendant.  Melamed's active presence in the courtroom removes this case from the strict confines of *Cronic* jurisprudence.

McFarland describes Melamed as an attorney so inexperienced, inept, and inattentive that he was not of greater legal assistance than a sleeping co-counsel.  The court's independent review of the record reveals that McFarland was not without counsel.  Melamed prepared for trial.  Melamed formed defense strategy, was familiar with the prosecution's theory, and was ready to try the case.  Melamed was active in the courtroom and defended his client.  Melamed said he was prepared to try the case himself.[23]  Melamed was an active presence in the courtroom, even while Benn apparently slept.

The court does not approve of a sleeping lawyer.  This is unacceptable by an attorney in any case, and particularly in a case of this magnitude.  The question before the court is whether the court of criminal appeals unreasonably applied federal constitutional law.  It did not.  McFarland was never completely without counsel.  The court's strong disapproval of Benn's sleeping is not a reason to grant the writ.  The court of criminal appeals' decision that Melamed's representation removed this case from *Cronic*'s presumption of prejudice was not unreasonable under AEDPA.

7.    *Strickland*.

In his second claim, McFarland argues that he can show deficient performance and resulting prejudice under *Strickland*.  A criminal defendant's Sixth Amendment rights are "denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense."[24]  *Strickland* presumes that counsel

---

[20]      262 F.3d 336 (2001) (*en banc*).

[21]      *McFarland*, 163 S.W.3d at 753.

[22]      *Burdine*, 262 F.3d at 349; *see also Hall v. Thaler*, 504 F. App'x 269, 277-78 (5th Cir. 2012) ("The court correctly held that Hall is not owed a presumption of prejudice as was found in *Burdine* . . . because Hall was represented at trial by two attorneys.").

[23]      Tr. Vol. 22 at 53.

[24]      *Yarborough v. Gentry*, 540 U.S. 1, 3 (2003); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

performed competently and used strategic judgment in all decisions. A court not only gives counsel the benefit of the doubt, but "affirmatively entertain[s] the range of possible reasons [he] may have had for proceeding as [he] did."[25]

A petitioner must also show actual prejudice, meaning that absent counsel's error there is a reasonable probability that the result of the proceedings would have been different.

Before turning to McFarland's claim, the court reiterates that its role is not to enforce the best practices of the legal profession much less an ideal trial. There is a difference between the standards attorneys should strive to achieve and the circumstances under which AEPDA permits a federal court to grant the habeas writ. On federal habeas review, ineffective-assistance claims overlap with AEDPA's "highly deferential" standards.[26] *Strickland* itself "strongly presume[s]" that counsel has "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."[27] AEDPA compounds that deference and supplies a "doubly deferential judicial review" of a state court's denial of a *Strickland* claim.[28] In such cases, the "pivotal question" for this court is not "whether defense counsel's performance fell below *Strickland*'s standard"; it is "whether the state court's application of the *Strickland* standard was unreasonable."[29]

McFarland bases his *Strickland* claim generally on Benn's sleeping and specifically on both attorneys' inadequate pretrial investigation, deficient trial performance, and laxity in preparing for the penalty phase.

### A. *Benn's sleeping.*

Benn's sleeping, while appalling, alone does not require relief under *Strickland*. Like the state courts, this court will not "condone Benn's behavior."[30] But while Benn apparently slept, Melamed cross-examined witnesses, formulated defensive strategy, and otherwise protected McFarland's interests. This court must look to specific actions and inactions of the defense team and their impact on the trial.

### B. *Investigation and pre-trial preparation.*

McFarland raises specific complaints about trial counsel's pre-trial preparation. Trial counsel has a duty to make a reasonable investigation. Courts review what counsel did to prepare, what evidence counsel accumulated, what else counsel knew, and what else counsel

---

[25]    *Pinholster*, 563 U.S. at 196.

[26]    *Richter*, 562 U.S. at 105.

[27]    *Burt v. Titlow*, 571 U.S. 12, 17 (2013) (quotation omitted).

[28]    *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

[29]    *Richter*, 562 U.S. at 101, 105.

[30]    *McFarland*, 928 S.W.2d at 505.

should have investigated.[31] An inmate must show what his attorneys failed to find and how it would have changed the outcome.

McFarland says that trial counsel did not interview the State's witnesses, particularly Craige Burks and Carolyn Bartie; investigate the other men Craige Burks had implicated in the robbery; interview Walter Burks, McFarland's uncle who testified before the grand jury; find other witnesses; and investigate the unadjudicated offenses the State presented in the penalty phase. Some of these allegations overlap with McFarland's allegations about counsel's trial performance and will be discussed together.

McFarland catalogues many errors by trial counsel which he did not support with facts in state court. AEPDA limits federal review to those issues McFarland has raised in state court and supported with evidence. For example, McFarland claims that counsel should have interviewed Walter Burks and called him as a witness. McFarland's federal pleadings include an affidavit from Walter Burks. McFarland did not present that affidavit in state court. McFarland also claims that trial counsel should have interviewed other men who allegedly helped in the Kwan robbery without showing the state court what information they might have furnished. This court may only consider the factual record that was before the state court in determining the reasonableness of that court's findings and conclusions.[32]

The court of criminal appeals rejected McFarland's challenge to counsel's investigation both on direct appeal and on state habeas review. The court of criminal appeals found that Melamed made the strategic decision not to interview the State's trial witnesses because "he believed it would not have been a good expenditure of investigator's fees, and he viewed prosecution witnesses as being generally unwilling to voluntarily [sic] cooperate with defense counsel."[33] McFarland claims that trial counsel should have investigated other witnesses. McFarland gave Melamed a list of witnesses to call, but he could not find them. Melamed proposed calling other witnesses, including Walter Burks, but McFarland "rejected all of these suggestions."[34] Melamed testified in the evidentiary hearing that he personally visited the crime scene and also "had his investigator visit the crime scene, canvass nearby locations in an attempt to find other eyewitnesses, photograph the crime scene, construct a scene diagram, and review the ballistics report and offense reports with him."[35] The court of criminal appeals reviewed the penalty phase testimony and found no reason to believe that the defense had not familiarized themselves with the information that witnesses would provide.[36]

---

[31]     *See Neal v. Puckett*, 286 F.3d 230, 237 (5th Cir. 2002).
[32]     *Pinholster*, 563 U.S. at 182.
[33]     *McFarland*, 163 S.W.3d at 754 (quotations omitted).
[34]     *McFarland*, 163 S.W.3d at 755.
[35]     *Id.*
[36]     *McFarland*, 928 S.W.2d at 502.

With that investigation and those decisions, the court of criminal appeals found that the attorneys developed a "a two-pronged defense trial strategy": "(1) that the person who committed the murder 'committed, at most, felony murder rather than capital murder'; and (2) that the evidence was insufficient to prove, beyond a reasonable doubt, that [McFarland] was present and committed the offense."[37]

The court of criminal appeals' rejection of McFarland's inadequate-preparation argument was not unreasonable. Melamed testified in both the motion for new trial hearing and state habeas evidentiary hearing. He detailed the defense's efforts to prepare for trial. The defense filed many motions, tried to exclude evidence, hired an investigator, and researched legal issues. While certainly not as comprehensive as it could have been, trial counsel made an investigation into the facts and circumstances of the crime. Trial counsel tried to contact witnesses. Melamed and McFarland agreed not to call others. McFarland was at times unhelpful and obstructionist. Counsel's efforts were not perfect, but the Constitution does not guarantee perfect representation. The court of criminal appeals did not unreasonably apply federal law in finding no constitutional error in the pre-trial investigation and preparation.

    C.  *Performance at trial.*

McFarland claims that trial counsel ineffectively cross-examined Carolyn Bartie and Craige Burks.[38] McFarland also says that Benn's punishment-phase argument bolstered the State's case against him.

    (1)  *Bartie.*

Bartie witnessed the crime from her car. Bartie initially told police: "[i]t all happened so fast that I don't think I would be able to identify either of the guys who robbed the store. I could try, but I'm not sure."[39] She provided the police an initial description of the men. Bartie made a "strong tentative" identification of McFarland in a photographic array. She later identified him with even more certainty in a live lineup.

Melamed tried to exclude Bartie's identification in a pre-trial suppression hearing. He argued that Bartie's identification was unreliable because she did not have enough time to observe McFarland at the crime and there were suggestive factors in the photographic array and lineup.

---

[37]    *McFarland*, 163 S.W.3d at 755; State Habeas Record at 721-22.

[38]    For the first time in his federal petition, McFarland also alleges ineffectiveness for failing to challenge evidence concerning a Chevrolet Suburban found near the crime and the Crime Stoppers report. The court will not address arguments made for the first time on federal review.

[39]    Dkt. 1, Exhibit 2.

Bartie testified in her direct testimony that she recognized McFarland's face.[40] She had no doubt in her mind that McFarland was the man who shot Kwan.  It does not appear that her identification was based at all on McFarland's stature or build.  She recognized his face.

Benn cross-examined Bartie at trial.  If Benn slept during her direct examination, it is not in the record.  Melamed later described Benn's cross-examination as "rather cursory."[41] McFarland says that Benn should have highlighted differences between her initial description and McFarland's appearance at trial.  He also could have emphasized inconsistences between her account and that of other witnesses.

Benn, however, made other strategic choices about how to challenge her testimony.  He brought out that Bartie initially said that she was not sure she could make an identification.[42]  He also questioned her ability to recognize McFarland in the photographic array a month after the crime and at the lineup weeks after that.  Benn's questioning allowed his closing argument to emphasize Bartie's initial concerns about identification.  Benn told jurors it was not likely that her memory improved in the weeks before she identified McFarland in a live lineup.[43]

On both direct appeal and habeas review, McFarland claimed that Benn should have impeached Bartie's trial testimony with her earlier statements.[44]  McFarland argued on direct appeal that Benn should have pointed out that Bartie was more sure of the identification at trial than she had been in the photographic array.  The court of criminal appeals found no significant differences in Bartie's testimony because she "did identify [McFarland] in the photo spread and signed the back of the photo denoting such."[45]  Also, the court of criminal appeals found that it was "acceptable trial strategy not to risk reinforcing the fact that, even if she was unsure of the photo, that she was absolutely sure that [McFarland] was the perpetrator after the live lineup."[46]

On state habeas review, McFarland argued that Benn should have confronted Bartie with differences between her account and that of eyewitness James Powell.  Also, McFarland argued that Benn should have pointed out differences between her initial description of

---

[40]      Tr. Vol. 16 at 258.
[41]      State Habeas Evidentiary Hearing at 81.
[42]      Tr. Vol. 16 at 261-64.
[43]      Tr. Vol. 17 at 28-89.
[44]      McFarland said that Benn should have pointed out differences in Bartie's story including what kind of shirt McFarland had been wearing and whether she saw him fire a gun.  The Court of Criminal Appeals found that McFarland misconstrued the record and that there was no difference in Bartie's testimony.  *McFarland*, 928 S.W.2d at 506.
[45]      *McFarland*, 928 S.W.2d at 506.
[46]      *Id.*

McFarland and his appearance at the time of trial, primarily in his skin color, height, and weight.[47]

The state district court found that "Bartie identified [McFarland] in both a photospread and a live lineup; therefore, it would have been reasonable trial strategy not to risk reinforcing Bartie's absolute identification of [him] in the lineup."[48]  In denying this claim, the court of criminal appeals emphasized that cross-examination is "inherently risky" and "[i]t is frequently a sound trial strategy not to attack a sympathetic eyewitness without very strong impeachment" because it may otherwise "risk[] reinforcing the eyewitness' previous identification of the defendant as the assailant."[49]  The court of criminal appeals further stated that "cross-examination is an art, not a science, and it cannot be adequately judged in hindsight."[50]

McFarland makes the same arguments in his federal petition.  The state habeas court's conclusions on direct review and on habeas review were not unreasonable.  This court's independent review of the record reveals that Benn's cross-examination of Bartie was based on sound strategic choices and was not constitutionally defective.  Benn asked Bartie about her initial skepticism in making an identification but could not shake Bartie from her insistence that she recognized McFarland's face.  Perhaps Benn could have identified other inconsistencies or differences in her identification but would have done so at the expense of emphasizing her firm resolve that she recognized McFarland.

Benn also did not ask Bartie about differences between her account and Powell's.  For instance, Bartie said that one of the assailants had their arm around Powell.  Powell said that no one touched him.  Their testimony also differed on whether the shooter was the man seen holding the bag of leaves.  The record does not suggest that asking Bartie any questions about those differences would have resulted in different testimony, but instead could have reinforced her credibility.

Counsel left alone those witnesses whose testimony comported with their theories.  Defense counsel's cross-examination of Bartie pointed out problems with her identification without risking additionally reinforcing her account.  This approach allowed Benn to highlight Bartie's uncertainty after the offense and emphasize that there was no reason to believe her memory would improve.  Melamed focused his closing argument on how differences between Bartie and Powell's accounts weakened the credibility of her

[47]     Bartie initially described the assailant as being about 5'7" and 140 pounds.  McFarland claims he was 6'2" and 200 pounds at the time of trial.  To corroborate Powell's initial statement to the police, the prosecution emphasized that McFarland was 6'1½" tall.  Tr. Vol. 17 at 23.  McFarland also claims that his skin tone is not the "medium brown" color she described in her police statement.

[48]     State Habeas Record at 725.

[49]     McFarland, 163 S.W.3d at 756.

[50]     Id.

11

identification. With that record, the state court's rejection of any challenge to the cross-examination of Bartie was not unreasonable under AEDPA.

    (2)    *Craige Burks.*

McFarland also faults counsel's cross-examination of Craige Burks. Four days after the offense, Craige Burks contacted Crime Stoppers to report that McFarland said he was involved in the Kwan robbery-murder. At trial, Craige Burks testified that on the day of the Kwan murder McFarland took him, his uncle Walter Burks, and his brother Cedric for a ride in a new car. McFarland told the group that he "robbed the Chinese guy. He pulled a pistol on a security guard and shot the dude, the Chinese guy."[51] McFarland said that they stole $50,000. Craige Burks said that McFarland made contradictory statements and also said that Albert Harris fired shots.

On state habeas review, McFarland argued that trial counsel should have pointed out differences in Craige Burk's testimony before the grand jury, such as that McFarland admitted to the robbery at a family member's house, not in a car. Also, McFarland relied upon an undated post-trial affidavit purportedly signed by Craige Burks contradicting much of his trial testimony.

The court of criminal appeals found no deficient performance or prejudice in Melamed's cross-examination of Burks. The court of criminal appeals found that differences between the grand jury and trial stories would not have mattered much but would result in "impeachment on a relatively minor issue."[52] Also, nothing indicated that Craige Burks would have told anyone the version of events in his affidavit before he testified at trial. The affidavit was obviously prepared many years after trial.

The court of criminal appeals decision was reasonable under AEDPA. Melamed zealously questioned Burks. Melamed's aggressive cross-examination revealed that Craige Burks received $900 from Crime Stoppers for his information. Melamed asked Craige Burks about his admission to a mental institution and otherwise questioned his mental state. Counsel explored Craige Burks' criminal history, and he admitted on cross that he made a deal with the State that resulted in a reduced charge in an aggravated robbery prosecution. Melamed had Craige Burks acknowledge that the police never arrested the other men that McFarland had implicated in the crime.

Melamed's cross-examination allowed the defense to discount his testimony during closing arguments because he was a convict, car thief, and liar who turned in his uncle for money and testified against him for a reduced sentence. Even if Melamed missed opportunities to undercut Craige Burks' testimony on minor points, the court of criminal

---

[51]    Tr. Vol. 15 at 131-32.

[52]    *McFarland*, 163 S.W.3d at 756.

appeals was not unreasonable to find no deficient performance or actual prejudice in the cross-examination.

          (3)    *Closing argument.*

      McFarland complains about Benn's closing remarks during the penalty phase. As part of his brief closing argument, Benn told jurors that "[i]f we could exchange George's life for his [Mr. Kwan's], I would say alright, but killing one man is not going to bring back the life of another man. Eye for an eye, a tooth for a tooth went out of civilized religion a long time ago."[53] McFarland complains that Benn essentially conceded his guilt and minimized the effect of mitigating evidence.

      The court of criminal appeals was skeptical of calling Benn's language a concession of guilt because it "merely accepted what the jury had already decided."[54] Benn made that statement in the penalty phase, after the jury found McFarland guilty. The court of criminal appeals was correct in finding that Benn's words did not admit that his client killed Kwan. Instead of minimizing mitigating evidence, Benn's language discouraged jurors from automatically voting for death. Nothing in the record suggests that McFarland disapproved of this approach.

      Because attorneys have great latitude in making closing arguments, the court of criminal appeals' rejection of his claim was not unreasonable. Also, McFarland had not shown that the jury would have decided differently if Benn had argued differently.

      D.    *Investigation and presentation of penalty evidence.*

      McFarland complains that trial counsel did not do anything to prepare for the penalty phase. The defense case at punishment lasted fifteen minutes. Melamed explained in the state evidentiary hearing that Benn took responsibility for preparing for the penalty phase. There is no evidence of what Benn did, however. Melamed did ask McFarland about his life and discussed potential punishment-phase witnesses. The record, however, does not suggest that the trial attorneys interviewed family members, employed an investigator to gather mitigating evidence, or otherwise developed a punishment case. McFarland says that trial counsel should have called more mitigation witnesses and investigated the unadjudicated offenses presented by the State.

---

[53]     Tr. Vol. 20 at 26.

[54]     *McFarland*, 163 S.W.3d at 758.

(1)    *Mitigating evidence.*

An attorney has an affirmative duty to investigate mitigating evidence;[55] however, an inmate cannot merely allege that his attorney should have called more or different witnesses. He must name the witnesses, identify what they would have said, and show that it would have been helpful.[56] The court of criminal appeals found that, "[d]espite his writ allegation that counsel should have called any number of witnesses, including family members, [McFarland] names only one potential mitigating witness: Richard Frankoff."[57]

Frankoff represented McFarland in other criminal charges. In the motion-for-new-trial hearing, Melamed said that McFarland himself did not want Frankoff to testify. The court of criminal appeals found no error because counsel honored that decision.[58]

On state habeas review, Frankoff supplied an affidavit saying that McFarland was "friendly and agreeable" and not a "violent man."[59] This was hardly weighty evidence. Melamed testified in the evidentiary hearing that he spoke with Frankoff and made the strategic decision not to call him as a witness.[60]

The court of criminal appeals found that McFarland's "attorneys might well have made a wise strategic decision in not calling" Frankoff because he had defended McFarland in a violent robbery "which was essentially a mirror image of this case."[61] "Given the potential hazards involved," and the fact that McFarland "himself specifically requested that Mr. Frankoff not be called to testify," the court of criminal appeals found no error in counsel's "strategic decision."[62]

Even though McFarland's lawyers could have done a better mitigation investigation, McFarland has not shown that he merits federal habeas relief. McFarland's attorneys should have engaged in a robust investigation into possible mitigating circumstances. They only called three witnesses. But McFarland has not shown that a meaningful mitigation investigation would have resulted in helpful testimony. McFarland would know of mitigating evidence and supplied none. McFarland has only identified one witness who trial counsel failed to call. The court of criminal appeals was not unreasonable to find no error in counsel honoring their client's wish not to call Frankoff, especially when his testimony could have proved detrimental to the defense. It is only speculation that additional witnesses would have had testimony that would have resulted in a stronger case for a life sentence. McFarland has

---

[55]    *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).
[56]    *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010).
[57]    *McFarland*, 163 S.W. 3d at 757.
[58]    *McFarland*, 928 S.W.2d at 501.
[59]    State Habeas Record at 160.
[60]    State Habeas Record at 720.
[61]    *McFarland*, 163 S.W.3d at 757.
[62]    *Id.* at 757-58.

14

not specified what other mitigating evidence counsel should have been aware of, but did not investigate, which would have made a difference at trial. The court of criminal appeals, therefore, was not unreasonable in its decision regarding trial counsel's handling of mitigation evidence.

      (2)    *Other crimes.*

McFarland says his trial attorneys should have challenged the State's evidence that he committed other crimes, including the Wal-Mart robbery. McFarland focused his motion for a new trial on this claim. He only briefly mentioned the allegation on state habeas review without developing its substance. The testimony in the motion for a new trial was not conclusive. McFarland and his wife said that they told the attorneys that other men had committed the Wal-Mart robbery. McFarland's co-defendant in the Wal-Mart robbery testified that "the word on the street was that" other men committed the crime.[63] One of those men testified that he had been in a lineup for the robbery, but no one had identified him.

The testimony in the motion for a new trial did nothing to disprove McFarland's commission of the Wal-Mart robbery. While a zealous attorney would have investigated the circumstances of the crime, the motion for a new trial resulted in unverified rumors and trifling testimony that would not have made any difference at trial. McFarland has not brought forth any evidence or testimony that a reasonable attorney could have used to counter the prosecution's evidence that he had committed violent crimes. McFarland has not shown *Strickland* error regarding counsel's investigation of unadjudicated offenses.

    E.    *Prejudice.*

An inmate must show both deficient performance and actual prejudice. Under *Strickland*, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[64] The court of criminal appeals identified *Strickland* as the governing law and applied it to the facts of McFarland's case in two separate published opinions. The court of criminal appeals reasonably applied federal law.

Trial counsel did not face an indefensible prosecution. Trial counsel knew that testimony from two witnesses supported the charges against McFarland. Trial counsel made some effort to challenge those witnesses. McFarland was not helpful in identifying witnesses. Greater efforts by counsel may have questioned McFarland's role as the shooter and his presence at the murder. But both Benn and Melamed made some effort in their closing

---

[63]    Tr. Vol. 22 at 8.

[64]    466 U.S. at 694; *see also Wiggins*, 539 U.S. at 134.

arguments to point out differences in the eyewitness recollection of the robbery.[65] The testimony still allowed for McFarland's conviction as a party to the offense. Trial counsel challenged eyewitness testimony, but the jury chose to believe otherwise. McFarland also only speculates that investigation and additional cross-examination would have resulted in testimony that would have convinced jurors to decide his guilt differently.

This is not a case where the trial court ignored a defendant's constitutional rights. The prosecution engaged in no misconduct. While not perfect, the attorneys made efforts to defend McFarland. Viewing the evidence and McFarland's choices in trial, McFarland has not shown that a different strategy would have ended in a different result.

It is regrettable that Benn slept through trial. That does not change the fact that the court of criminal appeals did not misapply the law. The court of criminal appeals conclusions on direct appeal and habeas review were not unreasonable under AEDPA.

8.    *Suppression of evidence.*

McFarland's third habeas claim argues that the prosecution suppressed exculpatory evidence in violation of *Brady v. Maryland*.[66] Specifically, McFarland argues that the prosecution withheld: (1) information about Craige Burks' credibility; (2) Crime Stoppers reports about Craige Burks' phone call; and (3) Walter Burks' grand jury testimony. McFarland also argues that the existence of that *Brady* material showed that the prosecution presented false evidence at trial.

Three essential elements compose a valid *Brady* claim: "The evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."[67] Courts often add a fourth requirement: "nondiscovery of the allegedly favorable evidence was not the result of a lack of due diligence."[68]

A.    *Suppression of evidence in the state habeas proceedings.*

McFarland was convicted in 1992. Since then, Craige Burks has sworn affidavits both recanting and reaffirming his trial testimony.[69] McFarland conjectures that Craige Burks'

---

[65]    Tr. Vol. 17 at 26-27, 35-38.

[66]    373 U.S. 83 (1963).

[67]    *Banks v. Dretke*, 540 U.S. 558, 691 (2004) (quotation omitted).

[68]    *United States v. Walters*, 351 F.3d 159, 169 (5th Cir. 2003).

[69]    In 1997, Craige Burks recanted his trial testimony in an affidavit. During state habeas review, the State submitted affidavits dated February 11, 2003, and April 28, 2003, in which Craige Burks reaffirmed his trial testimony. His 2003 affidavits explain that he signed the 1997 affidavit at the urging of family members and others claiming to be McFarland's lawyers, who met with him several

16

volatility means that the State coerced his trial testimony. There is no evidence of this. This claim lacks merit.

     B.     *Crime Stoppers records.*

Craige Burks contacted Crime Stoppers with information about the Kwan murder. The custodian of records for Crime Stoppers testified before trial that no recording was made of Craige Burks' phone call and that handwritten notes of his phone call were destroyed in the normal course of business.[70]

Craige Burks, however, said in a 1997 affidavit that he never called Crime Stoppers. He later recanted the statements in that affidavit. McFarland alleges that Craige Burks never actually contacted Crime Stoppers and that no report was ever made. McFarland says that, if the report never existed, the State fabricated testimony about that report. Even if a report had been made, he claims that the prosecution should not have allowed its destruction.

McFarland's attorneys at trial asked Craige Burkes about the report. Melamed asked him about receiving $900 for calling Crime Stoppers. The state habeas court found that McFarland "fail[ed] to show that the state improperly withheld such evidence or that such evidence would have been favorable to [McFarland's] defense or would have affected the outcome of the primary case."[71] Other than Craige Burks' recanted 1997 affidavit, nothing in the record casts doubt on his trial testimony about him making a report. Craige Burks was always available to McFarland. McFarland could ask about the circumstances and content of his Crime Stoppers telephone call.

The destruction of records relating to his phone call do not amount to a *Brady* violation. Lost or destroyed evidence only results in a *Brady* violation when it possesses "an exculpatory value that was apparent before the evidence was destroyed" and is of "such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."[72] McFarland's speculation that no report ever existed, or that destruction of records relating to it violated the Constitution, cannot command federal habeas relief. The state court's rejection of this claim was not unreasonable under AEDPA.

     C.     *Walter Burks' grand jury testimony.*

McFarland contends that the prosecution failed to turn over a transcript of his brother-in-law Walter Burks' grand jury testimony, which he could have used to impeach

---

times and paid him some money. Craige Burks said that he never read the 1997 affidavit and never recanted his trial testimony to anyone.

[70]     Tr. Vol. 2 at 118-21.

[71]     State Habeas Record at 748.

[72]     *California v. Trombetta*, 467 U.S. 479, 489 (1984).

Craige Burks' trial testimony.  Melamed claimed in his state habeas affidavit that he did "not recall" seeing Craige or Walter Burks' grand jury testimony.  His trial notes include information from Craige Burks' grand jury testimony, implying that he had access to Walter Burks' testimony.  There is no evidence that the State withheld this evidence.  A valid *Brady* claim requires more than speculation about suppression.[73]  The state habeas court's rejection of this claim was not unreasonable.

9.      *The lineup.*

McFarland complains that his Sixth Amendment right to counsel was violated because he did not have an attorney present when Bartie identified him in a police lineup.  A Harris County judge issued a warrant for McFarland's arrest on January 2, 1992.  The police arrested him the next day.  He then appeared in a police lineup, but did not have an attorney present.  McFarland signed a form waiving counsel and consenting to the lineup.[74]  McFarland disputes that fact.  The State filed a complaint against him on January 4, and he was indicted on March 27, 1992.

McFarland contends that he had a right to an attorney because the prosecution began adversarial proceedings against him before the lineup.  McFarland's argument hinges on the use of the words "complaint" and "accused" in the warrant.  McFarland says that the warrant bears indicia of starting judicial proceedings against him, triggering his right to counsel.

The court of criminal appeals denied this claim because the right to counsel had not attached.  The State had not yet filed a criminal complaint, taken him before a judge, or even actually identified McFarland as having been involved in the crime.

The state court decision was not unreasonable.  The right to an attorney is not triggered by an arrest warrant alone.[75]  The right to counsel attaches when "adversary judicial proceedings have been initiated . . . ."[76]  No right to counsel exists for a lineup occurring after arrest but before indictment or other formal criminal charge.[77]  The state court's rejection of this claim was not unreasonable because the arrest warrant did not trigger the guaranty of McFarland 's right to an attorney.

---

[73]      *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000) ("Allegations that are merely 'conclusionary' or are purely speculative cannot support a Brady claim.").

[74]      Tr. Vol. 2 at 37-38.

[75]      *See Doggett v. United States*, 505 U.S. 647, 664 n.2 (1992) ("In other words, for purposes of the right to counsel, an 'accused' must in fact be accused of a crime; unlike the speedy trial right, it does not attach upon arrest.").

[76]      *Kirby v. Illinois*, 406 U.S. 682, 688 (1972).

[77]      *See id.*

10.    *The jury charge.*

McFarland alleges that the trial court violated the Constitution by not including two instructions in the jury charge. McFarland argues that the trial court should have: (1) instructed the jury that Texas' law of parties has no application in the penalty phase, and (2) informed the jury of Texas' parole laws. The law has consistently and regularly rejected both claims.[78] The state court's denial of those claims was not an unreasonable application of law under AEDPA.

11.    *Unadjudicated offenses.*

McFarland challenges punishment phase testimony about other crimes he committed. During the punishment phase, the State presented testimony about McFarland's previous convictions, including for aggravated robbery, theft, assault, and evading arrest. The prosecution also presented evidence of three unadjudicated offenses: the robbery of a Wal-Mart, threatening someone with a loaded gun, and possession of a stolen vehicle. McFarland argues that the prosecution did not prove he committed the Wal-Mart robbery under a beyond-a-reasonable-doubt standard.

The Constitution does not require the prosecution to prove unadjudicated offenses beyond a reasonable doubt.[79] Though not without weaknesses, the prosecution presented testimony connecting McFarland to the Wal-Mart crime. The jury was free give the Wal-Mart robbery whatever weight it wished. Considering McFarland's long and violent criminal history, the jury could have favored a death sentence without finding that McFarland committed the Wal-Mart offense. This court cannot say that the trial court should not have allowed that testimony to come before the jury. The state court's decision was reasonable.

12.    *Certificate of appealability.*

Although McFarland has not yet requested a certificate of appealability for his claims, the issue of a certificate is likely to arise. This court may deny a certificate on its own motion. A certificate will issue only if the petitioner has made a "substantial showing of the denial of

---

[78]    Numerous cases have denied claims relating to the absence of an anti-parties charge, *see Garcia v. Davis*, 704 F. App'x 316, 321 (5th Cir. 2017) (anti-parties charge not necessary because context of special issues provided for individualized sentencing); *Pystash v. Davis*, 854 F.3d 830, 841 (5th Cir. 2017) (context of penalty phase makes charge unnecessary); *Nichols v. Scott*, 69 F.3d 1255, 1268 (5th Cir. 1995) (same); *Belyeu v. Scott*, 67 F.3d 535, 543 (5th Cir. 1995) (special issues sufficiently provide individualized sentencing), and a parole eligibility instruction, *see Cantu v. Quarterman*, 341 F. App'x 55, 59 (5th Cir. 2009) ("[T]his circuit has repeatedly refused to . . . require that Texas juries be informed of a defendant's future parole eligibility").

[79]    *See Harris v. Johnson*, 81 F.3d 535, 541 (5th Cir. 1996); *Turner v. Johnson*, 106 F.3d 1178, 1188-89 (5th Cir. 1997).

a constitutional right."[80]   McFarland's claims do not entitle him to a certificate of appealability.[81]

13.    *Conclusion.*

The district judge who presided in McFarland's trial did his duty thoughtfully. Although changes – by McFarland, his counsel, and the state – could have been made to have had a better handled case, the record shows a constitutionally acceptable trial.  This court cannot disrupt the results in a principled way.  "Though the penalty is great and our responsibility heavy, our duty is clear."[82]

The court denies McFarland's petition for a writ of habeas corpus.  The court will dismiss this case.  The court will not certify any issue for review on appeal.

Signed on April  2  , 2019, at Houston, Texas.

Lynn N. Hughes
United States District Judge

---

[80]      28 U.S.C. § 2253(c)(2); *see also Miller-El v. Cockrell,* 537 U.S. 322, 336-37 (2003); *Slack v. McDaniel,* 529 U.S. 473, 484 (2000).
[81]      *See* 28 U.S.C. § 2253(c).
[82]      *Rosenburg v. United States,* 346 U.S. 273, 296 (1953).